**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**BECKLEY DIVISION**

| | | |
|---|---|---|
| **MIGUEL QUINONES,** | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO. 5:06-0072** |
| | ) | |
| **JIM RUBENSTEIN, *et al.,*** | ) | |
| **Respondents.** | ) | |

<u>**PROPOSED FINDINGS AND RECOMMENDATION**</u>

On February 2, 2006, Petitioner, acting *pro se* and formerly incarcerated at Mount Olive

Correctional Complex, Mount Olive, West Virginia,[1] filed a Petition Under 28 U.S.C. § 2254 for

Writ of Habeas Corpus By a Person in State Custody.[2] (Document No. 1.) Petitioner alleged the

following grounds for *habeas* relief:

I.     Violation of Sixth Amendment:
     A.     Ineffective Assistance of Counsel.
     B.     Denial of compulsory process to obtain witnesses in his favor.

II.    Violation of Fifth Amendment and Fourteenth Amendment:
     A.     Due Process of Law
          1.     Prosecutorial misconduct.
          2.     Judicial prejudice in evidentiary rulings and jury composition ruling.
          3.     Excessive sentence imposed.
     B.     Denial of equal protection under the laws:
          1.     Denial of "full and fair" habeas corpus proceedings to question grounds raised as mandated by West Virginia law.
          2.     Denial of "reasonable" habeas corpus hearing by lower court in not addressing grounds asserted, mandated by § 2254.

---

[1] Petitioner is no longer incarcerated at the Mount Olive Correctional Complex. He is currently incarcerated at Huttonsville Correctional Complex.

[2] Because Plaintiff is acting *pro se*, the documents which he has filed in this case are held to a less stringent standard than if they were prepared by a lawyer and therefore, they are construed liberally. *See Haines v. Kerner*, 404 U.S. 519, 520-21, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972).

        3.     Failure of State court to properly address record of proceedings and apply legal precedent of state law equity.

III.    Violation of Eighth Amendment:
      A.    Cruel and unusual punishment inflicted:
           1.     Length of sentence to that of co-defendant.
           2.     Conviction without evidence of guilty beyond reasonable doubt.
           3.     Court's failure to rectify unlawful lower court rulings.

(Document No. 1, p. 23.)

The undersigned submitted his Proposed Findings and Recommendations on February 19, 2008, recommending that Respondent's "Motion to Dismiss for Failure to Exhaust State Court Remedies" be granted as to Ground II(B)(1), (2), and (3), and Ground III(A)(1), (2), and (3), and denied as to Ground I(A) and (B), and Ground II(A)(1), (2), and (3). (Document No. 41.) By Memorandum Opinion and Judgment Order filed on March 27, 2008, the District Court adopted undersigned's Proposed Findings and Recommendations. (Document No. 50.) Accordingly, this matter was remanded to the undersigned for further proceedings. On April 4, 2008, the undersigned directed Petitioner to file a brief explaining specifically the factual and legal basis for his claims as set forth in Grounds I(A) and (B) and Grounds II (A)(1), (2), and (3). (Document No. 51.) On May 6, 2008, Petitioner filed his "Brief in Support of Petitioner's Grounds Requesting Habeas Corpus Relief." (Document No. 52.) In support of Grounds I and II(A), Petitioner alleges as follows:

I.    Ineffective Assistance of Counsel:
      A.    Counsel failed to do a preliminary investigation of state witnesses and defense witnesses.
      B.    Counsel failed to file any pre-trial motions.
      C.    Counsel violated rules of professional conduct by using the trial proceedings as a forum to play a "hoax" on Beckley Register Herald Reporter George Gannon.
      D.    Counsel failed to subject the States case to meaningful adversarial testing in light of impeachment evidence against State witnesses Heather Taylor and Diane Green.

2

II.     Prosecutorial Misconduct:
 A.     The prosecutor's office committed prosecutorial misconduct when he failed to forward a copy of discovery upon attorney Travers Harrington when a request for discovery was made.
 B.     The prosecutor's office committed prosecutorial misconduct when he failed to produce evidence that his office solicited that was favorable to the defendant before the grand jury.
 C.     The prosecutor's office committed prosecutorial misconduct when he gave information to a newspaper in violation of ABA Code of Professional Conduct.
 D.     The prosecutor's office committed prosecutorial misconduct by neglecting to testify truthfully as to the circumstances surrounding the taking of the statement of State witness Miguel Gonzalez for the purposes of having favorable evidence for the accused suppressed.
 E.     The prosecutor committed prosecutorial misconduct by asking the jury to deliberate on matters that were deemed to not be evidence, by the court, in order to arrive at a guilty verdict.
 F.     The prosecutor violated rules of professional conduct when he referred to the defense witnesses as liars to the jury during closing arguments.
 G.     The prosecutor committed prosecutorial misconduct when he gave inflammable prejudicial closing arguments asking the jury to deliver a verdict based on speculated consequences of a not guilty verdict.
 H.     The prosecutor committed prosecutorial misconduct when he used this petitioner's ethnicity and place of geographical origin to inflame the jury.

III.    Errors in Jury Composition:
 A.     The court committed error by refusing to strike juror Dale Wagner for cause.

IV.     Judicial Prejudice / Misconduct in Evidentiary Rulings;
 A.     The court committed error in not allowing individual voir dire for jurors and testimony to be taken by George Gannon after prejudicial pretrial publicity.
 B.     The court committed error by denying counsels motion to utilize the statement of Miguel Gonzalez as evidence under the unavailable declarant standard and exception to the hearsay rule standard (Rule 804(b)(3)).
 C.     The court committed error by giving false claims as to reviewing the statement of Miguel Gonzalez.
 D.     The court committed error by failing to overrule the objection of counsel for the defendant when prosecutor gave closing arguments of a possible robbery motive after the court ruled that no evidence

existed to present this motive to the jury.
     E.    The court committed error by not granting this petitioner credit for all the time served in custody as a sole result of the charge for which he was convicted.

    V.    Disparity of Sentencing:
     A.    There was a disparity of sentencing when this petitioner received a term of 25 years in the West Virginia State Penitentiary, more time than any other co-defendant, although he had the least involvement.

    VI.    Cumulative Effect of all Errors.
     A.    This court has jurisdiction to overturn the conviction if in light of the effect of all cumulative errors, petitioner's trial process was unconstitutional.

By Standing Order, this matter was referred to the undersigned United States Magistrate Judge for the submission of proposed findings of fact and a recommendation for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). (Document No. 3.)

## PROCEDURAL HISTORY

On January, 14, 1998, the Grand Jury of Fayette County, West Virginia, returned an Indictment against Petitioner, charging him with murder. State v. Quinones, Criminal Action No. 98-F-3 (Cir. Ct. Fayette Co. October 2, 2000). (Document No. 23-2, Exhibit 1.) Following a jury trial conducted on August 8 - 11, 2000, Petitioner was convicted of second degree murder. (Id., Exhibit 2.) By Order entered October 2, 2000, Petitioner was sentenced to a determinate period of twenty-five years in the State penitentiary. (Id., Exhibit 3.)

On August 6, 2001, Petitioner, by counsel, James W. Keenan, Esquire, appealed his conviction and sentence to the Supreme Court of Appeals of West Virginia [SCAWV], raising the following assignments of error:

    A.    That it was error for the Court not to strike for cause prospective jurors Wagner and Browning.

4

B.      That it was error for the Court not to grant a mistrial for prosecutorial misconduct and not grant the Defendant's motion to take testimony of the Prosecuting Attorney of Fayette County and the media representative, Mr. Gannon.

C.      That it was error for the Court not to grant the Defendant's motion to undertake individual voir dire of the jury under the circumstances of the case.

D.      That it was error of the Court to deny the Defendant's motion to present the statement of the alleged co-defendant/accomplice, Gonzalez.

(Id., p. 18, Exhibit 4.) The SCAWV refused Petitioner's Petition by Order entered on November 5, 2001. State v. Quinones, Case No. 011694 (W.Va. Nov. 5, 2001). (Id., p.12, Exhibit 4.)

On January 4, 2002, Petitioner, proceeding *pro se*, filed his Petition for Writ of Habeas Corpus in the Circuit Court of Fayette County. Quinones v. Rubenstien, Civil Action No. 02-C-3 (Cir. Ct. Fayette Co. Aug. 3, 2004). (Id., p. 28, Exhibit 5.) Petitioner raised the following grounds for *habeas* relief:

A.      Unconstitutional Search and Seizure of Evidence. Authorities entered residence of 212 Midway without a search warrant then when it was concluded that the area may have been a crime scene authorities left and returned with a search warrant.

B.      Prosecutorial Misconduct. Unconstitutional failure to disclose evidence favorable to the defendant, false statements made by prosecutor on record, prejudice statements made by prosecutor to prejudice jury. Not disclosing all inducements to witnesses.

C.      Judicial Prejudice. Allowing unconstitutionally selected jury panel to be selected. Allowing unconstitutionally, an unfair and impartial actions of the prosecutor, making false statements on record. Not granting time served, harsh sentence considering facts. Not granting counsel of record relief in appeal process.

D.      Ineffective Assistance of Counsel. Attorney's client file and Court file will reveal break down in communication. Prior to trial, Complaint filed to lawyer disciplinary board. Record will reveal the lack of competence, diligence and communication on behalf of counsel of record.

(Id., pp. 31-32, Exhibit 5.) The Circuit Court appointed counsel, James W. Blankenship, III, Esquire,

to represent Petitioner. (Id.) On April 18, 2003, Petitioner filed a *pro se* amended Petition. The amended Petition contained the following grounds for relief:

> Amended Ground 1:  The petitioner contends his state and federal constitutional rights under both the West Virginia and United States Constitutions to equal protection, due process of law, and a fair and impartial jury trial were violated due to ineffective assistance of trial counsel, James W. Keenan, and violated Article II, Sections 10, 14 and 17 of the West Virginia Constitution and the First, Sixth and Fourteenth Amendments to the United States Constitution.

> Amended Ground 2:  The petitioner by and through the undersigned counsel argues the trial court violated the petitioner's state and federal constitutional rights under both the State of West Virginia and United State's Constitutions to equal protection, due process of law, and a fair and impartial jury trial because of prosecutorial misconduct of the State in failing to advise the petitioner's defense counsel of exculpatory evidence at trial.

> Amended Ground 3:  The petitioner by and through the undersigned counsel argues the trial Court committed reversible error when Honorable Charles M. Vickers, Judge presiding, denied the petitioner's defense motion to admit his co-defendant, Miguel Gonzalez's exculpatory statement, which was voluntary given; that proved the petitioner was not involved with or did not commit the murder of the victim in this case. The trial Court erred by not reviewing each and every admission of the statement into the evidence and not allowing it to be read. Whereas the Court in one instance, during the meeting in chambers with regards to the admission of the statement, stated that he had not read the statement and approximately one five minutes into the conference, the proceedings got heatedly argumentative the court stated that the statement had been read and the court refused to allow the statement.

> Amended Ground 4:  The petitioner contends the trial court erred in denying his motions for a directed verdict of acquittal for want of sufficient evidence of the elements of first and second degree murder, and in allowing the jury to consider a charge of first and second degree murder when the facts of the State's case clearly demonstrated that he was not guilty of any degree of unlawful homicide.

> Amended Ground 5:  The petitioner contends he was denied due process of law as guaranteed by the Fourteenth Amendment to the Constitution of the United States of America when the Circuit Court of Fayette County violated his constitutional rights to the equal protection of the laws and to substantive and procedural due process of law because of the gross and unwarranted disparity between the petitioner's sentence and his two co-defendants' sentences which violates the constitutional provisions against disproportionate sentences.

Amended Ground 6:  The petitioner contends his state and federal constitutional rights under both the West Virginia and United States Constitutions to equal protection, due process of law, and fair and impartial jury trial were violated because it was reversible trial error for the trial Court not to strike for cause prospective jurors Dale Wagner and John Browning.

Amended Ground 7:  The petitioner contends his state and federal constitutional rights under both the West Virginia and United States Constitutions to equal protection, due process of law, and a fair and impartial jury trial were violated because it was reversible trial error for the trial Court not to grant a mistrial for prosecutorial misconduct and not to grant the petitioner's defense motion to take testimony of the prosecuting attorney of Fayette County and the media representative, Mr. Gannon, and that it was also error for the trial Court not to grant the petitioner's motion to undertake individual voir dire of the jury under the circumstances of the case.

Amended Ground 8:  The Petitioner by and through the undersigned counsel contends his state and federal constitutional rights to equal protection, due process of law, and a fair and impartial jury trial were violated because the State of West Virginia by the presiding trial Court judge, Honorable Charles M. Vickers, committed judicial misconduct which violated the petitioner's right to a fair trial.

Amended Ground 9:  The petitioner by and through the undersigned counsel contends the trial court committed a deluge of reversible and prejudicial errors violating all his state and federal constitutional rights to equal protection, due process of law, a fair and impartial jury trial due to the cumulative effect of errors committed by the State's prosecuting attorney, trial court judge and trial counsel during his pretrial, trial, and post trial court proceedings.

(Document No. 33-2, pp. 3-11.) Counsel subsequently filed a Petition and an amended Petition on

Petitioner's behalf. On May 29, 2003, the requisite "Losh List"[3] was filed and an omnibus *habeas*

---

[3] In *Losh v. McKenzie*, 166 W.Va. 762, 768 - 770, 277 S.E.2d 606, 610 - 611 (1981), the West Virginia Supreme Court of Appeals stated that "[o]nce a circuit court grants a pro se habeas corpus petition and appoints counsel for the petitioner, both counsel and the petitioner must raise all issues which are known to them or which, with reasonable diligence, would become known to them. That is a reasonable rule of procedure since the universe of all grounds for successful collateral attack on underlying convictions is comparatively small." The *Losh* Court listed fifty-three of the most frequently raised grounds. With some exceptions, grounds not raised are waived. *See Nagye v. Seifert*, 2005 WL 2405946, *4 (S.D.W.Va.)(Faber, C.J.);   *Markley v. Coleman*, 215 W.Va. 729, 732 - 733, 601 S.E.2d 49, 52 - 53 (2004).

*corpus* hearing was conducted.[4] (Document No. 23-2 and 26-2.) By Order dated August 5, 2004, the

Circuit Court of Fayette County found that Petitioner waived all grounds except the following:

I.      Ineffective Assistance of Counsel:
    a.    Counsel failed to conduct an adequate investigation.
    b.    Counsel did not adequately advise and prepare the petitioner to testify.
    c.    Counsel failed to subject the State's case to meaningful adversarial testings.
    d.    Counsel's deficient performance of his duties led to a harsher sentence.
    e.    The cumulative effect of all of counsel's deficiencies resulted in ineffective assistance of counsel denying the petitioner due process of law.

II.     The Court erred in refusing to strike jurors Browning and Wagner for cause.

III.    Petitioner was improperly convicted of a more serious offense than were his co-defendants and punished disproportionately to his involvement in the crime; the punishment imposed is shocking to the conscience.

(Document No. 23-2 , p. 37, Exhibit 6.) During the omnibus hearing, the Circuit Court heard

testimony from Petitioner and Petitioner's trial counsel, James W. Keenan. (Document No. 48,

———————————————

[4] The following errors were asserted in the "Losh List":
1.    Prejudicial pretrial publicity.
2.    Suppression of helpful evidence by prosecutor.
3.    Ineffective assistance of counsel.
4.    Refusal of continuance.
5.    Refusal to subpoena witnesses.
6.    Constitutional errors in evidentiary rulings
7.    Instructions to the jury.
8.    Claims of prejudicial statements by prosecutor.
9.    Sufficiency of evidence.
10.  Severer sentence than expected.
11.  Excessive sentence.
12.  Failure of Court to strike for cause prospective jurors.
13.  Judicial misconduct during trial
14.  Failure of Court to permit individual voir dire regarding publicity.
      (Document No. 26-2.)

Exhibit No. 15.) By order dated August 4, 2004, the Circuit Court made findings of fact and conclusions of law addressing the grounds raised by Petitioner, and denied his *habeas* petition on the merits. (Document No. 23-2, pp. 36-41, Exhibit 6.)

On November 18, 2004, Petitioner, proceeding *pro se*, filed his petition for appeal from the Circuit Court's decision.[5] State ex rel. Quinones v. Rubenstein, No. 32661 (W.Va. Nov. 30, 2005). By Order entered May 9, 2005, the Supreme Court granted the Petitioner's appeal. (Document No. 23-3, p. 43, Exhibit 7.) Petitioner's appointed counsel, Jack Hickock, filed a Supplemental Petition for Appeal on December 7, 2004. (Document No. 37-2, Exhibit 11.) On June 9, 2005, Petitioner's counsel filed a Brief asserting the following errors:

> A.   Counsel provided ineffective assistance to Petitioner in the following ways:
>
>> 1.   Counsel failed to conduct an adequate investigation.
>> 2.   Counsel did not adequately advise Petitioner and did not prepare him to testify.
>> 3.   Counsel failed to subject the State's case to meaningful adversarial testing.
>> 4.   But for counsel's deficient performance of his duties to Petitioner, it is probable that the outcome of the prosecution would have been a lesser sentence.

---

[5] Petitioner raised the following grounds for relief:

1.   Ineffective Assistance of Trial Counsel.
2.   Prosecutorial Misconduct.
3.   Judicial Prejudice/Misconduct.
4.   Refusal to grant motion for acquittal.
5.   Failure of Judge to draft comprehensive order on all grounds raised and argued in petition.
6.   Disparity of sentencing.
7.   Failure to strike jurors John Browning and Dale Wagner for cause.
8.   Failure to grant motion for mistrial and individual voir dire of jurors as to prosecutorial misconduct.
9.   Commutative effect of error.
10.  Ineffective assistance of post conviction habeas counsel.
11.  Error to not grant co-defendants statement to be read and used at trial.
     (Document No. 26-3, pp. 5 - 8.)

9

B.      The cumulative effect of all of counsel's deficiencies was that he received ineffective assistance of counsel, with the result that he did not receive due process of law.

C.      The Court erred in refusing to strike jurors Browning and Wagner for cause.

D.      The following assignments of error are raised in the *pro se* petition but not fully developed in this brief:

      1.      The Habeas Court did not consider all grounds raised by Appellant, and did not rule upon them in his final Order;

      2.      The Habeas Court accepted false allegations from the State regarding extradition and included them as findings of fact;

      3.      There was insufficient evidence to convict Appellant of murder; and

      4.      The Trial Court erred in not conducting individual voir dire of jurors concerning a highly prejudicial statement made to a television reporter by the Prosecuting Attorney or granting a motion for a mistrial due to prejudicial publicity.

(Document No. 23-3, p. 3, Exhibit 8.). Additionally, a supplemental *pro se* brief was attached to

counsel's brief.[6] (Document No. 37-2, Exhibit 12.) By per curiam opinion filed November 30, 2005,

---

[6] Petitioner's *pro se* brief identified the following as alleged errors:

A.      Presiding Judge did not inquire into all grounds raised in the petition.

B.      Trial Court did not draft a comprehensive order on the merits of issues raised which were supported by fact.

C.      Trial Court added information it knew, or should have known, to be false in its order.

D.      Trial Court erred in not reversing the unlawful conviction on the ground of ineffective assistance of counsel.

E.      Trial Court erred in not reversing the conviction on the ground of prosecutorial misconduct for withholding exculpatory evidence and giving false statements to the court and prejudice.

the SCAWV affirmed the rulings of the Circuit Court of Fayette County. State ex. rel. Quinones v. Rubenstein, 218 W. Va. 388, 624 S.E.2d 825 (2005); (Id., p. 59.) The SCAWV confined its review to issues having constitutional ramifications, which were ineffective assistance of counsel and failure to strike jurors for cause.[7] State ex. rel. Quinones v. Rubenstein, 218 W. Va. at 393, 624 S.E.2d at

> F.   Trial Court erred in not reversing the unlawful conviction on the ground of Judicial prejudice/misconduct in the manner it refused exculpatory statements made by a witness who was unavailable and other actions.
>
> G.   Trial Court erred in not reversing the unlawful conviction on the ground of denying his motion for acquittal for lack of evidence to convict and in allowing the jury to consider any charge of any degree of murder.
>
> H.   Trial Court erred in not vacating the unlawful sentence imposed upon the defendant on the ground of gross unwarranted disparity of sentence to that of his co-defendant, considering the facts.
>
> I.   Trial Court erred in not reversing the unlawful conviction on the ground of the court not striking prospective jurors Dale Wagner and John Browning for cause.
>
> J.   The Trial Court made reversible error in refusing to grant a motion for mistrial and refusing to grant petitioners motion for testimony of the media representative, Mr. Gannon, Paul Blake, and refusing individual voir dire of jurors to investigate another charge of prosecutorial misconduct and juror bias.
>
> K.   Trial Court erred in not overturning the unlawful conviction on the ground of cumulative effect of errors during the trial, pre-trial, and post-trial.
>
> L.   This petitioner further contends he was subjected to ineffective assistance of post conviction habeas corpus counsel.
>     (Document No. 37-2, Exhibit 12.)

[7] The SCAWV recognized that Petitioner asserted additional errors not stated within counsel's brief. The Court noted "that during his testimony at the omnibus hearing Appellant, in response to a question posed by the presiding judge, indicated that he was waiving all issues except his claims of being deprived of a fair trial due to ineffective assistance of counsel and being disproportionately punished in light of his level of involvement in the crime." *State ex. rel. Quinones v. Rubenstein*, 218 W. Va. at 393, 624 S.E.2d at 830.

830.

Petitioner filed the instant Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus By a Person in State Custody on February 2, 2006. (Document No. 1.) By Order entered on February 9, 2007, the undersigned directed Respondent to show cause, if any, why Petitioner's Petition should not be granted. (Document No. 18.) On March 2, 2007, in response to the Court's Order, Respondent filed his Answer, Motion to Dismiss and Memorandum in Support thereof with exhibits. (Document Nos. 22 - 24.) Petitioner filed a Reply and Objections to Respondent's Motion to Dismiss on March 14, 2007. (Document Nos. 25 and 26.) On December 14, 2007, Notice pursuant to Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975), was issued to Petitioner, advising him of his right to file a further response to Respondent's Motion to Dismiss. (Document No. 32.) Petitioner filed on January 7, 2008, an additional Response to Respondent's Motion to Dismiss.(Document No. 33.) On February 5, 2008, Respondent filed his Reply to Petitioner's Response. (Document No. 37.)

On February 19, 2008, the undersigned submitted his Proposed Findings and Recommendations recommending that Respondent's "Motion to Dismiss for Failure to Exhaust State Court Remedies" be granted as to Ground II(B)(1), (2), and (3), and Ground III(A)(1), (2), and (3), and denied as to Ground I(A) and (B), and Ground II(A)(1), (2), and (3). (Document No. 41.) Petitioner filed objections on March 4, 2008. (Document No. 44.) The District Court overruled Petitioner's objections and adopted undersigned's Proposed Findings and Recommendations by Memorandum Opinion and Judgment Order filed on March 27, 2008. (Document No. 50.) Accordingly, this matter was remanded to the undersigned for further proceedings. On April 4, 2008, the undersigned directed Petitioner to file a brief explaining specifically the factual and legal basis for his claims as set forth in Grounds I(A) and (B) and Grounds II (A)(1), (2), and (3). (Document

12

No. 51.)

On May 6, 2008, Petitioner filed his "Brief in Support of Petitioner's Grounds Requesting Habeas Corpus Relief." (Document No. 52.) First, Petitioner alleges that counsel acted ineffectively by (a) failing to investigate all prosecution and potential defense witnesses, (b) failing to file any pretrial motions, (c) using Petitioner's trial to play a "hoax" on a reporter from the Beckley Register Herald, and (d) failing to impeach the testimony of Heather Taylor and Diane Green. (Document No. 52, pp. 5 - 9.) Second, Petitioner alleges prosecutorial misconduct because the prosecutor (a) failed to produce exculpatory evidence, (b) failed to present exculpatory evidence to the grand jury, (c) improperly made a statement regarding the case to the Beckley Register Herald, (d) testified falsely, (e) referenced facts not in evidence in his closing statement, (f) referred to defense witnesses as liars in his closing statement, (g) asked jury to "deliver a verdict based on speculated consequences of a not guilty verdict," and (h) improperly referred to Petitioner's ethnicity and place of geographical origin to inflame the jury. (Id., pp. 10 - 14.) Third, Petitioner alleges that the trial court erred in refusing to strike Juror Dale Wagner for cause. (Id., pp. 14 - 17.) Fourth, Petitioner alleges that the judge acted with prejudice and misconduct by (a) refusing to declare a mistrial, (b) refusing admit the out-of-court statement of Miguel Gonzalez, (c) allowing prosecutor to refer to a possible robbery motive in closing statement, and (d) failing to award Petitioner credit for time served. (Id., pp. 18 - 22.) Fifth, Petitioner alleges that his sentence was in disparity with co-defendants' sentences. (Id., pp. 22 - 24.) Finally, Petitioner contends that the cumulative effect of all errors resulted in a violation of the due process clause. (Id., pp. 24 - 25.)

On June 5, 2008, Respondent filed his Consolidated Response, Motion to Dismiss, and Motion for Summary Judgment. (Document No. 57.) Respondent contends that in view of the

13

overwhelming evidence of guilt presented during the trial, any alleged error does not rise to the level of a constitutional violation and therefore, is harmless. (Id., pp. 6 - 8.) In addressing the merits of Petitioner's individual claims, Respondent next contends that he has failed to state a cognizable federal *habeas* claim. (Id., pp. 10 - 43.) First, Respondent asserts that Petitioner's claim of ineffective assistance of counsel is without merit. (Id., pp. 10 - 15.) Respondent argues as follows: (a) Petitioner "has not cited to a specific witness nor the content of any additional witnesses' testimony that would have been significant enough to alter the outcome of the proceedings" (Id., p. 12.); (b) Petitioner's blanket assertion that trial counsel failed to file pretrial motions is insufficient to demonstrate a claim of ineffective assistance of counsel (Id., p. 13.); (c) Petitioner's claim that trial counsel involved a local newspaper reporter in a "hoax" at trial has not been properly exhausted (Id., p. 14.); and (d) Petitioner fails to present an "argument or evidence compelling enough to rebut the presumption that the findings of the West Virginia Supreme Court are correct." (Id., 15.)

Second, Respondent contends that Petitioner's claim of prosecutor misconduct is without merit because Petitioner fails to demonstrate that any act of the prosecutor was either improper or prejudicial. (Id., pp. 15 - 16.) Specifically, Respondent argues as follows: (a) Petitioner's claim that the prosecutor failed to provide exculpatory evidence to the grand jury has not been properly exhausted, and even if exhausted, it fails to state a federal claim (Id., p. 16.); (b) Petitioner has not stated a claim with respect to Brady material because the prosecutor ultimately provided defense counsel with a copy of Miguel Gonzalez's statement (Id., pp. 16 - 18.); (c) Prosecutor's alleged inflammatory statement was made to the media, not at trial, and there was no evidence that any potential juror was exposed to the comments (Id., pp. 18 - 19.); (d) The prosecutor's alleged false assertion regarding the veracity of Miguel Gonzalez's statement was made during a bench

14

conference concerning the admissibility of the evidence, which cannot constitute prosecutorial misconduct (Id., pp. 19 - 21.); (e) The Prosecutor did not argue for a conviction of felony murder during closing statements (Id., pp. 21 - 23.); (f) "[C]omments of the prosecutor on the credibility of the witnesses at trial was a fair inference from the evidence and no more" (Id., pp. 23 - 24.); (g) The prosecutor did not make prejudicial comments in closing concerning Petitioner's ethnicity (Id., pp. 24 - 26.); and (h) "[T]here was nothing in the comments made by the prosecutor that distorted the jury's ability to make a fair decision based on the evidence presented at trial." (Id., pp. 26 - 27.)

Third, Respondent argues that there is no evidence that Juror Dale Wagner demonstrated disqualifying prejudice or bias. (Id., pp. 27 - 29.) Fourth, Respondent asserts that there is no evidence that the trial court's evidentiary rulings were fundamental unfair. (Id., pp. 29 - 32.) Specifically, Respondent states as follows: (a) "[T]here was no evidence to support either a mistrial or an individual voir dire but speculation" (Id., pp. 32 - 34.); (b) Petitioner fails to demonstrate how the contents of Gonzalez's statement would have altered the outcome of the proceedings (Id., pp. 34 - 36.); (c) "[A]ny inconsistent statements made by the court during the motions hearing is absolutely irrelevant and has no bearing on the outcome of the proceedings independent of the ruling itself" (Id., p. 36.); (d) Prosecutor's remarks during closing statements about a drug deal prior to the murder and victim's possible possession of $6,000 was supported by the evidence and did not render the trial fundamentally unfair (Id., pp. 37 - 38.); and (e) Petitioner fails to provide any "controlling authority for the proposition that a defendant earns credit towards time served while fighting extradition pursuant to an escape to another jurisdiction."(Id., pp. 39 - 40.) Fifth, Respondent contends that Petitioner's sentence was not unconstitutionally disparate with that of his co-defendant because Petitioner did not enter into a plea, escaped from custody, and was a fugitive for

approximately one year. (Id., pp. 40 - 41.) Finally, Respondent alleges that Petitioner has failed to establish that actual constitutional errors were committed during his trial and therefore, his claims of error, even if harmless, cannot be evaluated under the legitimate cumulative error analysis. (Id., p. 42.)

On June 18, 2008, Petitioner filed his "Reply and Objections" to Respondent's Response. (Document No. 58.) In his Reply, Petitioner continues to present similar arguments to those presented in his brief. Petitioner further contends that the "determination of the WVSCA is flawed" concerning his *habeas* claims.(Id., pp. 5 - 10, 19, 21 - 22.) Therefore, Petitioner asserts that his relief must be granted because there is "substantial evidence of the unconstitutional nature of the prosecution that resulted in his unlawful conviction." (Id., p. 26.)

Notwithstanding Petitioner's Reply, Notice pursuant to Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975), was issued to Petitioner on December 5, 2008, advising him of his right to file a further response to Respondent's Motion to Dismiss, or in the alternative Motion for Summary Judgment. (Document No. 60.) On December 17, 2008, Petitioner filed his "Response to Respondent's Motion to Dismiss." (Document No. 61.) In his response, Petitioner requests that the Court "take and incorporate this Petitioner's reply and objections, filed in this court on or about June 21, 2008, to this response as argument in response to the respondent's Motion to Dismiss." (Id.)

## THE APPLICABLE STANDARDS

Federal *habeas* relief is available to a state prisoner under 28 U.S.C. § 2254, only if the prisoner "is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a)(2002); See also Sargent v. Waters, 71 F.3d 158, 160 (4th Cir. 1995). Section

2254(d) provides that when the issues raised in a § 2254 Petition were raised and considered on the merits in State Court *habeas* proceedings, federal *habeas* relief is unavailable unless the State Court's decision:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

In Williams v. Taylor, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000), the Supreme Court stated that under the "contrary to" clause in § 2254(d)(1), a federal *habeas* Court may grant *habeas* relief "if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts." Williams, 529 U.S. at 412-13, 120 S.Ct. at1523. A federal *habeas* Court may grant relief under the "unreasonable application" clause of § 2254(d)(1) where the State Court identified the appropriate Supreme Court precedent but unreasonably applied the governing principles. Id. In determining whether the State Court's decision was contrary to, or was an unreasonable application of, Supreme Court precedent, all factual determinations by the State Court are entitled to a presumption of correctness. 28 U.S.C. § 2254(e).[8] On this framework,

---

[8] Title 28, U.S.C. Section 2254(e) provides:

(e)(1) In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

(2) If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that –

consideration should be given to Respondent's Motion to Dismiss and for Summary Judgment.

**Summary Judgment**

Summary judgment is appropriate under Federal Rule of Civil Procedure 56 when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Once the moving party demonstrates the lack of evidence to support the non-moving party's claims, the non-moving party must go beyond the pleadings and make a sufficient showing of facts presenting a genuine issue for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 - 87, 106 S.Ct.1348, 89 L.Ed.2d 538 (1986). All inferences must be drawn from the underlying facts in the light most favorable to the non-moving party. Matsushita, 475 U.S. at 587, 106 S.Ct. at 1356. Summary judgment is required when a party fails to make a showing sufficient to establish an essential element of a claim, even if there are genuine factual issues proving other elements of the claim. Celotex, 477 U.S. at 322 - 23, 106 S.Ct. at 2552 - 53. Generally speaking, therefore, summary judgment will be granted unless a reasonable jury could return a verdict for the non-moving party on the evidence presented. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 - 48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If no facts or inferences which can be drawn from the circumstances will

---

      (A) the claim relies on –
            (I) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
            (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
      (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

18

support Petitioner's claims, summary judgment is appropriate.

## FACTUAL BACKGROUND

Based upon a review of the record, it appears that Petitioner traveled from New York to West Virginia on June 1, 1995. (Document No. 57, Exhibit 18, p. 89.) Since the death of Petitioner's mother in 1991, Petitioner lived "from house to house" in New York.[9] (Id., p. 86.) Petitioner's friend, Miguel Gonzalez, traveled from West Virginia to Massachusetts for a visit in May, 1995. (Id., p. 86 - 87.) Mr. Gonzalez, who was originally from New York, had been residing in West Virginia for a few months prior to his visit. (Id.) Mr. Gonzalez invited Petitioner to return to West Virginia with him, and Petitioner did so because things were "not going too well" in New York. (Id., pp. 86 - 88.) In West Virginia, Petitioner and Mr. Gonzalez resided in a house with Damien Bagut located at 212 Midway in Summerlee. (Id.)

Steven Dalton, the victim's brother-in-law, testified that he and the victim had traveled to 212 Midway in Summerlee approximately "60 times or more" to purchase crack cocaine. (Id., Exhibit 16, pp. 89 - 91, and 101.) Mr. Dalton stated that the residence was occupied by "a black female and three black males." (Id., p. 91.) Mr. Dalton identified the three males as Damian, Mikey, and the Petitioner.[10] (Id.) Mr. Dalton testified that the residents of 212 Midway and the victim had a disagreement in May, 1995, and "Denny shot through their window, and then they shot the window out of his van." (Id., pp. 102 - 103.) Mr. Dalton stated that Damian and Mikey had "threatened to kill Denny" on a prior occasion. (Id., p. 103.) Mr. Dalton last visited the residence

---

[9] Petitioner was thirteen at the time of his mother's death. (Document No. 57, Exhibit 18, p. 85 - 86.)

[10] Miguel Gonzalez's was referred to as Mikey, and Petitioner was referred as Mike. (Document No. 57, Exhibit 16, p. 129 and 177.)

"the night before Denny was killed," which was June 18, 1995. (Id., p. 95.) Specifically, Mr. Dalton stated that he and the victim visited the above residence on two occasions on June 18, 1995: First, at approximately 1:45 a.m. when they purchased $150 worth of crack cocaine; Second, at approximately 3:00 a.m. when they purchased $200 worth of crack cocaine. (Id., p. 104.) Mr. Dalton testified that Damian and Mikey were in possession of guns on June 18, 1995. (Id.) Mr. Dalton stated that the victim had previously traded three guns to the above individuals for crack cocaine. (Id., p. 102.) Mr. Dalton indicated that the victim had "traded them a Ruger nine millimeter" just days before the shooting. (Id.) The last time Mr. Dalton saw the victim was at approximately 2:00 p.m., on June 19, 1995, when the victim "dropped off his baby" at Mr. Dalton's residence because the victim was going to 212 Midway in Summerlee to "pick up some weight."[11] (Id., pp. 89 - 91, and 101.) According to Mr. Dalton, the victim had $6,000 with him on June 19, 1995. (Id., pp. 96 and 104.)

Damien Bagut testified that the victim came to his residence on 212 Midway in the early afternoon on June 19, 1995. (Id., Exhibit 18, p. 49.) The victim allegedly requested that Mr. Bagut "front him some [drugs] till a later date." (Id., p. 69.) Mr. Bagut refused to "front" the drugs, but the victim continued to demand drugs and allegedly picked-up a gun off of the kitchen table. (Id., p. 50.) The victim initially kept the gun down by his side while he "pace[d] around the kitchen." (Id., p. 51.) When Mr. Bagut continued to refuse to provide the victim with drugs, the victim allegedly became aggressive. (Id.) Mr. Bagut then pulled his gun and told the victim that "Well, look. Both of us could go . . . because you ain't going to come here and rob me like that." (Id.) The victim then allegedly

---

[11] The word "weight" refers to a substantial amount of crack cocaine. (Document No. 57, Exhibit 16, Trial Transcripts, pp. 101 - 102.)

raised his gun and Mr. Bagut shot the victim once in the face. (Id.) Mr. Bagut testified that the

follow events occurred after the first shot:

> And when he kind of ran towards like the living room, that's when Mr. Quinones had woke up, and he grabbed Mr. Quinones on the wrist and like put a real hard lock on him. And I was trying to protect Mr. Quinones, and I shot him again. And he fell to the floor, and I shot him again to make sure he was gone, that he was no threat to me or Mr. Quinones or Mr. Gonzalez.

(Id., pp. 51 - 52.) Mr. Bagut stated that Petitioner and Mr. Gonzalez were asleep prior to the victim's

arrival and the subsequent shooting. (Id., p. 52.) Mr. Bagut testified that neither the Petitioner nor

Mr. Gonzalez had possession of a gun during the time of the shooting. (Id., pp. 52 and 54.)

Mr. Bagut acknowledged that two guns, a .380 and a 9 millimeter, were used in the shooting.

Mr. Bagut explained the use of two guns as follows: "Because when he had dropped it, I went - -

like when I shot him, when he grabbed Mr. Quinones, and I grabbed it once he fell so he couldn't

get it. So that's - - that's the gun I shot him with. I had the other one in my hand." (Id., pp. 53 - 54.)

Mr. Bagut admitted that he "disposed of the van with Mr. Reardon's body in it." (Id., p. 55.)

Mr. Bagut stated that the victim had "$80 in his hand" at the time of the shooting, which Mr. Bagut

took from the victim's body. (Id., p. 57.) After the shooting, Mr. Bagut suggested that he,

Mr. Gonzalez, and Petitioner should leave the area. (Id., p. 57.) The three individuals then drove to

Beckley, West Virginia, to visit Heather Taylor and Diane Green. (Id.) Mr. Bagut states that he

"spoke with Heather Taylor and Diane Green in order to get Heather to transport the three to New

York." (Id.) Mr. Bagut stated that he offered Heather money to drive them to New York. (Id.)

Petitioner testified concerning the events that occurred on June19, 1995. (Id., pp. 90 - 99.)

Petitioner contends that he was initially asleep when the victim arrived at the residence, but was

awakened by the first gun shot. (Id., p. 91.) After the first gun shot, Petitioner stated that "I

immediately arose from my sleep, and I went in the direction of where I heard this coming from."
(Id.) Petitioner testified that he saw the following: "I seen a man and Mr. Bagut. Mr. Bagut was
holding a gun. The man had a gun in his hand but, when he lunged at me, the gun fell to the ground."
(Id., pp. 91 - 92.) Petitioner stated that he tried to run away, but the victim grabbed him. (Id., p. 93.)
When the victim grabbed Petitioner, Mr. Bagut allegedly shot the victim a second time. (Id.) After
the second shot, Petitioner testified as follows: "Then after that, Mr. Bagut came towards him, and
I was just in such a state of shock that I just stood froze, and Mr. Bagut then again shot him again.
But don't let me forget that he did - - he picked up his pistol, also, from the ground." (Id., pp. 93 -
94.) After the shooting, Petitioner stated that he screamed profanities at Mr. Bagut and asked why
he shot the victim. (Id., p. 94.) Mr. Bagut allegedly responded that the victim "had made an attempt
to rob him." (Id.) Petitioner first noticed Mr. Gonzalez in the room after the shooting and during the
time he was screaming at Mr. Bagut. (Id., p. 95.) Petitioner testified that he never possessed a gun
at the time of the shooting and that he did not help dispose of the victim's body. (Id., pp. 93 and 95.)
Petitioner stated that Mr. Bagut and Mr. Gonzalez placed the victim's body in the van, and
Mr. Bagut drove the van away. (Id., pp. 95 and 97.) Petitioner stated that Mr. Bagut suggested that
they leave the area and that he knew "some girls in Beckley that would take us." (Id., p. 98.)
Petitioner testified that on the drive to New York, "I did not say nothing to the effect where I had
involvement in the shooting of Mr. Reardon. I truly believe that they were confused in what they
heard." (Id., p. 99.)

Heather Taylor and Diane Green testified that they were acquainted with Petitioner,
Mr. Bagut, and Mr. Gonzalez prior to June, 1995. (Id., Exhibit 16, p. 175 and Exhibit 17, p. 90.)
Ms. Taylor and Ms. Green stated that they saw the above individuals around 4:00 p.m. on June 19,

1995, at the Beckley West Apartments. (Id., Exhibit 16, p. 176 and Exhibit 17, p. 92.) Ms. Taylor and Ms. Green testified that they were sitting outside the apartment when the three individuals approached them and asked that they go inside the apartment. (Id.) Once inside the apartment, Mr. Bagut asked that Ms. Taylor drive them to New York stating that it was a "life or death situation." (Id., Exhibit 16, p. 178 and Exhibit 17, pp. 9 and 93.) Ms. Taylor initially refused, but later conceded after "Damien Bagut took out a gun and laid it on the table."[12] (Id., Exhibit 17, p. 9.) According to Ms. Taylor, the Petitioner and Mr. Bagut had the following conversation during the drive to New York:

> Damian had said that, "That M-F had been acting funny for the last couple of days and that he deserved what he got, that he wasn't nothing but a crack head." And they went on conversating some was in Spanish, some was not. And Damian had said that he shot Chris first and then Chris had ran towards Mike. Mike's gun had got jammed and he was running away from him. And at that time, his gun had - - when he got his gun un-jammed, he turned around and he shot him in the face or head.
>
> And then they spoke of - - Mike said that he - - Damian has asked, said, "What if he wasn't dead?" And he said, well, if he wasn't, the bag - - Mike said that the bag that he tied around his head or the rope that he tied around his neck would have killed him if the shots hadn't.

(Id., Exhibit 16, p. 180.) Mr. Taylor further testified that Mr. Bagut promised her a large sum of money to drive the three individuals to New York, but she only received $70.00. (Id., Exhibit 17, pp. 12 and 19.) According to Ms. Green, the Petitioner and Mr. Bagut had the following conversation during the drive to New York:

> Damien said that he shot this man first. The man got up, went towards Mike. Mike had a gun, but it was jammed. Something was wrong with the gun, so he took off

---

[12] Ms. Taylor stated that she initially refused because she had no one to keep her baby and the car belonged to her mother. (Document No. 57, Exhibit 17, p. 8.) The following individuals traveled to New York: Ms. Taylor, Ms. Green, Ms. Taylor's baby, Mr. Bagut, Mr. Gonzalez, and Petitioner. (Id., p. 13.)

running the opposite way. Well, I guess, when he got - - he said, when he got his gun
fixed to where, I guess, it clicked, he turned around, and he shot him. And Mikey
said, "That's when I woke up." He said, "I heard, you know, the gun shots, and I
woke up."

(Id., p. 97.)

Elizabeth Pankey testified she was familiar with the residence at 212 Midway in Summerlee.
(Id., Exhibit 16, p. 114.) Ms. Pankey indicated that she was paid to clean the house on a regular
basis. (Id., p. 125.) Ms. Pankey stated that "Damian, Mikey, [and] Mike" resided in the residence
and all three individuals had guns "on them." (Id., pp. 115 and 119.) Ms. Pankey testified that the
victim visited in the residence "just about every day" during June, 1995, to purchase crack cocaine.
(Id., pp. 116 and 123.)

Nick LaRocco testified that he discovered the victim's body at approximately 3:30 p.m. on
June 19, 1995. (Id., Exhibit 16, p. 76.) Mr. LaRocco stated that on his drive home from work he saw
what appeared to be an accident. (Id., p. 76 and 80.) Specifically, he stated that he observed "a
vehicle run down over the bank and the nose of it [was] down in the creek." (Id., p. 76.)
Mr. LaRocco stopped near to vehicle to see if anyone needed assistance. (Id.) Mr. LaRocco entered
the van through the back door, and observed a body lying in the back floor with "a rug or a blanket
or something thrown over him, with a trash bag over this head with a rope or string around his
neck." (Id., p. 78.) Once Mr. LaRocco observed the body, he "knew it wasn't [an] accident." (Id.,
p. 80.) Mr. LaRocco then asked Richard Mackey, another individual who had stopped at the
accident, to "stay here, I'm going to go call 911." (Id.) Mr. LaRocco then drove to a nearby business
to call 911.  (Id.) Mr. LaRocco returned to the scene until the police and paramedics arrived. (Id.)

Richard Mackey testified that he observed a "van in the ditch" on June 19, 1995. (Id., p. 82.)
Mr. Mackey stated that Mr. LaRocco "flagged [him] down," and asked that he wait with the van

until Mr. LaRocco went for help. (Id.) Mr. Mackey went to the van to see if anyone was inside, but found the individual "was already dead." (Id., p. 83.) Specifically, Mr. Mackey stated that victim's "head was stuck underneath the front seat like, like he was thrown, and had a quilt on him, I couldn't see his head so I was pulling the quilt off him, and I saw a bag over his - - wrapped around his throat, covered his head." (Id.)

Donald Clifford Newell, Jr., testified that he was the medical examiner called to examine the body found in the wrecked van on June 19, 1995. (Id., pp. 85 - 86.) Dr. Newell stated that prior to his arrival at the scene, the "paramedics had cut a plastic bag from [the victim's] head." (Id., p. 87.) Dr. Newell observed that the victim "was lying on his left side in the area between the seat rows of the van, and it appeared that the body had rolled forward when the van had gone down front-first into the creek. We moved the body and examined him for trauma and found several bullet holes." (Id.) Dr. Newell stated that he then contacted the State Medical Examiner and transferred the victim's body to Charleston for an autopsy, which is standard procedure. (Id.)

Zia Sabet, Deputy Chief Medical Examiner of the State of West Virginia, testified that he performed an autopsy on the victim. (Id., Exhibit 17, p. 64.) On external examination, Dr. Sabet stated that he discovered three gun shot wounds on the right side of the face. (Id., p. 66.) Dr. Sabet described the entrance and exit wounds as follows: (1) "the wound on the front of the right ear passed through the cheekbone . . . and upper jaw bone, passed through the neck and transected jugular vein, passed through the right chest cavity and passed through the upper and medial lobe of the lung and exited from the back;" (2) the "wound was behind the ear . . . passed through the parotid gland . . . passed through the oral cavity on the back of the oral cavity . . . and existed from the left side of the face;" and (3) "this bullet passed through the right side of the face, parotid gland,

oral cavity, exited from the left side of the face . . . and reentered the left upper shoulder." (Id., p. 66 - 67.) Dr. Sabot testified that he recovered "one medium caliber, jacketed, slightly deformed bullet on the left side of the shoulder on the upper side of the bone." (Id., pp. 67 - 68.) Dr. Sabet stated that one entrance wound showed evidence of close-range firing, but he could not determine the sequence of the wounds. (Id., pp. 66 and 83.) Dr. Sabot testified that the victim "died as a result of multiple, three, gunshot wounds of the head . . . and each individual bullet could be fatal because it passed through the vital organs." (Id., p. 67.) Dr. Sabot further stated that the toxicology report revealed a significant amount of cocaine in the victim's blood. (Id., pp. 70 - 71.) Dr. Sabot verified that cocaine use would result in a person experiencing "violent aggressive tendencies." (Id., p. 80.) Dr. Sabot acknowledged that the amount of cocaine in victim's blood could have caused "adverse and violent and desperate activities to endanger people and even cause harm." (Id., p. 82.)

Steve Kessler, a detective with the Fayette County Sheriff's Department, testified that he went to the residence at 212 Midway as part of his investigation. (Id., Exhibit 16, pp. 131 - 32.) Detective Kessler stated that they discovered blood inside the residence. (Id., p. 144.) Detective Kessler stated that they recovered three bullets: one from the kitchen wall; one "from the dryer which was on the boxed-in porch;" and one from living room wall. (Id., pp. 133 - 34.) Additionally, shell casings were recovered from the living room floor, the bedroom dresser, and the kitchen. (Id., pp. 134 - 35.) Detective Kessler acknowledged that he did not know when the bullets were fired, when the shell casing were emptied, and did not know which bullet came from which gun. (Id., pp. 147 - 48.)

Mitch Canterbury, a detective with the Fayette County sheriff's Department, testified he identified the victim's body and continued his investigation at 212 Midway. (Id., p. 154 - 55.) He

stated that he recovered Petitioner's billfold from the residence at 212 Midway.[13] (Id., p. 165.) Detective Canterbury testified that blood was discovered in the kitchen of the residence. (Id., p. 166.) Jeffrey Bowles, West Virginia State Trooper, testified that "inside the house was - - it was a crime scene. There was evidence there that blood had been attempted to be cleaned up. There were blood spatter patterns on the - - on everything in the kitchen area. Bullet casing laying on the floor." (Id., Exhibit, 17, p. 22.) Ted Smith, who is assigned to the biochemistry section with the West Virginia State Police, testified that he performed DNA testing on the victim's blood and the blood recovered from the 212 Midway residence. (Id., Exhibit 18, pp. 8 - 9.) Officer Smith stated that DNA results revealed that the victim's blood was the same as the blood recovered from the 212 Midway residence. (Id., p. 9.)

Clarence Ralph Lane, a firearm and tool mark examiner for the West Virginia State Police, testified that he examined the bullets and shell casings recovered from the 212 Midway residence and the bullet recovered from the victim's body. (Id., Exhibit 17, p. 37.) The bullet recovered from the victim's body was ".380 auto pistol bullet," but Officer Lane was unable to positively identify the weapon from which the bullet was fired. (Id.) Officer Lane stated that the shell casing were ".380 and 9 millimeter cartridge casings," but he was unable to identify whether they were fired by the same weapon "because the casings theirself didn't pick up enough characteristics from the firearm." (Id., p. 37 - 38.) Finally, Officer Lane testified that he examined the bullets recovered from the 212 Midway residence and two 9 millimeter bullets were identifiable as being fired from the same firearm. Officer Lane stated that neither of the 9 millimeter bullets matched the .380 bullet removed

---

[13]  Detective Canterbury testified that Petitioner's social security card and health card was discovered inside the billfold. (Document No. 57, Exhibit 16, p. 165.)

from the victim's body. (Id., p. 38 - 39.) Officer Lane verified that "all of the bullets that [he]

examined and all the casings that [he] examined were either fired by a .380 or a 9 millimeter." (Id.,

p. 51.) Officer Lane tested two guns: a Smith & Wesson and a Lorsen. (Id., p. 43.) Officer Lane was

unable to match the bullets and shell casings to either of the above weapons. (Id., pp. 43 - 44.)

## ANALYSIS

### A.    Procedural Default / Failure to Exhaust.

Pursuant to the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132,

110 Stat. 1214 [AEDPA], effective April 24, 1996, State prisoners must exhaust available State

remedies prior to filing a § 2254 petition in federal Court. 28 U.S.C. § 2254(b)(1)(A); see also,

McDaniel v. Holland, 631 F.Supp. 1544, 1545 (S.D.W.Va. 1986)("A federal court will not entertain

a state prisoner's petition for a writ of habeas corpus unless the prisoner has first exhausted available

state judicial remedies."). Section 2254(b)(1)'s exhaustion requirement can be satisfied in either one

of two ways: (1) the Petitioner can fairly present all claims in State Court, or (2) the Petitioner's

claims will be deemed exhausted if no State remedies are currently available. See Gray v.

Netherland, 518 U.S. 152, 161, 116 S.Ct. 2074, 2080, 135 L.Ed.2d 457 (1996). Fair presentation

requires the Petitioner to (1) present the same claims (2) to all appropriate State Courts. See

Matthews v. Evatt, 105 F.3d 907, 911 (4th Cir. 1997). Presentation of the same claim "contemplates

that 'both the operative facts and the 'controlling legal principles'' must be presented to the state

court." Id. (quoting Verdin v. O'Leary, 972 F.2d 1467, 1474 (7th Cir. 1992) (quoting Picard v.

Connor, 404 U.S. 270, 277, 92 S.Ct. 509, 513, 30 L.Ed.2d 438 (1971)). The requirement of

presentation of the same claim to all appropriate State Courts is designed to give "the state courts

one full opportunity to resolve any constitutional issues by invoking one complete round of the

28

State's established appellate review process." O'Sullivan v. Boerckel, 526 U.S. 838, 845, 119 S.Ct. 1728, 1732, 144 L.Ed.2d 1 (1999). This requirement is satisfied by presentation to the State's highest Court on either direct or collateral review. See O'Sullivan, 526 U.S. at 844, 119 S.Ct. at 1732.

Section 2254(b)(1)(B) provides, however, that a federal petition need not be dismissed for failure to exhaust if "there is an absence of available State corrective process" or "circumstances exist that render such process ineffective to protect the rights of the applicant." 28 U.S.C. § 2254(b)(1)(B)(I) and (ii). An "absence of available State corrective process" is created, in one instance, when the State Courts would refuse to review a petitioner's claims based on the petitioner's failure to comply with state procedural rules. See e.g., Mason v. Procunier, 748 F.2d 852 (4th Cir. 1984), cert. denied sub nom., Mason v. Sielaff, 471 U.S. 1009, 105 S.Ct. 1876, 85 L.Ed.2d 168 (1985). Under such circumstances, the petitioner's claims will be considered exhausted if the State procedural rule is adequate and independent. A State procedural rule is adequate "only if it is a 'firmly established and regularly followed state practice.'" Keel v. French, 162 F.3d 263, 268 (4th Cir. 1998), cert. denied, 527 U.S. 1011, 119 S.Ct. 2353, 144 L.Ed.2d 249 (1999)(internal citations omitted). The Fourth Circuit has held that unambiguous State statutes and Court rules are always firmly established. See Weeks v. Angelone, 176 F.3d 249, 270 (4th Cir. 1999), aff'd, 528 U.S. 225, 125 S.Ct. 727, 145 L.Ed.2d 727 (2000). A State procedural rule is independent if "it does not 'depend on a federal constitutional ruling.'" Burket v. Angelone, 208 F.3d 172, 183 (4th Cir. 2000), cert. denied, 530 U.S. 1283, 120 S.Ct. 2761, 147 L.Ed.2d 1022 (2001)(quoting Ake v. Oklahoma, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985)). Procedurally defaulted claims are considered exhausted for federal *habeas* purposes.

Claims that have been procedurally defaulted will not receive federal *habeas* review, however, unless the petitioner can establish either "cause and prejudice" for the default, or actual innocence. See Thomas v. Davis, 192 F.3d 445, 450 n.2 (4th Cir. 1999); Mueller v. Angelone, 181 F.3d 557, 584 (4th Cir.), cert. denied, 527 U.S. 1065, 120 S.Ct. 37, 144 L.Ed.2d 839 (1999). Cause is established when an objective factor external to the petitioner's actions impeded the ability to comply with the State's procedural rule. See Strickler v. Greene, 527 U.S. 263, 283 n.24, 119 S.Ct. 1936, 1949 n.24, 144 L.Ed.2d 286 (1999). The petitioner, however, must exhibit reasonable diligence to establish cause. See Hoke v. Netherland, 92 F.3d 1350, 1354 n.1 (4th Cir.), cert. denied, 519 U.S. 1048, 117 S.Ct. 630, 136 L.Ed.2d 548 (1996). Prejudice must be actual; the petitioner must show that the trial was infected with actual constitutional error which worked to his disadvantage. See McCarver v. Lee, 221 F.3d 583, 592 (4th Cir. 2000), cert. denied, 531 U.S. 1089, 121 S.Ct. 809, 148 L.Ed.2d 694 (2001); Tucker v. Catoe, 221 F.3d 600, 615 (4th Cir.), cert. denied, 531 U.S. 1054, 121 S.Ct. 661, 148 L.Ed.2d 563 (2000).

1. **Petitioner's claim that trial counsel used trial proceeding to "play a hoax" on a local reporter.**

Petitioner claims that counsel was ineffective because he used "the trial proceeding as a forum to play a 'hoax' on Beckley Register Herald reporter, George Gannon." (Document No. 52, p. 3.) Petitioner bases his claim upon a newspaper article written by Mr. Gannon several months after Petitioner's criminal trial had ended. Mr. Gannon wrote as follows:

> The most frightening moment of the past year was when a bench subpoena was issued against me during a trial. Upon the advice of one of my colleagues, I wrote what is called a "lead-in" story on a murder trial. I suppose this is done to all the new guys, a kind of journalistic hazing process. The defense lawyer in the case thought it would be good fun to get me on the stand, saying I had somehow swayed public opinion because of the article (never mind that the jury had already heard a morning of testimony). Before I realized it was some kind of barrister's trick, I had a

> sickening feeling that the Fayette County prosecuting attorney's office would hate me for tanking a case. Lucky for me, the judge knew it was all jive and let me off the stand without having to answer any questions. When I got back to my seat I had to smile while I envisioned all the senior reporters doubling over with laughter at my expense.

(Document No. 52, p. 40.) In his response, Respondent first argues that Petitioner failed to properly exhaust his available State Court remedies with respect to his claim that "trial counsel involved a local reporter in a 'hoax' at trial." (Document No. 57, p. 14.) Respondent further contends that "even if true, the attorney's 'hoax' could not have any possible effect on the outcome of the trial." (Id.)

After reviewing the record, the undersigned finds that Petitioner failed to properly exhaust his claim that counsel was ineffective in using trial proceeding to "play a hoax" on a local reporter. Petitioner failed to raise the above issue in his State *habeas* petition or in his appeal of the Circuit Court's denial of *habeas* relief to the SCAWV.[14] The undersigned notes that Petitioner does not dispute that he did not raise the above issue in his State Court proceedings, but contends he is "giving all additional facts which support his claim." (Document No. 58, p. 7.) The undersigned finds that Petitioner has not demonstrated that the State process was ineffective such that his failure to exhaust should be excused. Petitioner had the opportunity to the raise the above issue in his State proceedings, but failed to do so.[15] (Document No. 23-2, Exhibits 5 - 6, 8, Document No. 33-2, pp.

---

[14]  The record reveals that Petitioner, by counsel, filed a *habeas* petition in the Circuit Court of Fayette County raising the following as grounds for ineffective assistance of counsel: (1) Counsel failed to conduct an adequate investigation; (2) Counsel did not adequately advise and prepare the petitioner to testify; (3) Counsel failed to subject the State's case to meaningful adversarial testing; (4) Counsel's deficient performance of his duties led to a harsher sentence; and (5) The cumulative effect of all of counsel's deficiencies resulted in ineffective assistance of counsel denying the petitioner due process of law. (Document No. 23-2, p. 37, Exhibit 6.) Petitioner asserted the same grounds in his appeal to the SCAWV. (Document No. 23-3, p. 3, Exhibit 8.)

[15]  Petitioner acknowledged that he understood that all grounds must be raised during the omnibus hearing and any ground not raised would be barred in the future. (Document No. 48, Exhibit 15, pp. 38 - 39.)

3 - 11, and Document No. 37-2, Exhibit 12.) Petitioner further has not indicated, nor does the record suggest, any circumstance which hindered or impeded him from raising the aforesaid issue. Petitioner was represented and his requests for review of his conviction and sentence and the Circuit Court's denial of his Petition for *habeas* relief were submitted by counsel. The aforesaid issue must therefore be deemed procedurally defaulted or unexhausted and not properly before the District Court in this matter.

Even assuming the above claim not to be procedurally barred, Petitioner has failed to state a cognizable claim of ineffective assistance of counsel. The undersigned finds that Petitioner has failed to demonstrate (1) how counsel's performance was so deficient that it fell below an objective standard of reasonableness, and (2) if counsel's performance was deficient, how the deficiency resulted in prejudice so as to render the results of the trial unreliable. First, the undersigned finds that counsel was not deficient in calling Mr. Gannon as a witness. The record reveals that the trial court recessed for lunch following jury selection and opening statements. (Exhibit 16, pp. 1 - 66.) During recess, trial counsel discovered that the Beckley Register Herald had published an article concerning Petitioner's trial in that morning's newspaper. (Id., pp. 66 - 69.) Following this discovery, trial counsel moved for a mistrial and requested that the trial court issue a bench subpoena for Mr. Gannon. (Id., p. 66.) The State objected to the mistrial arguing that the court had properly inquired whether the jury had "read or heard anything about this case" and "none of the jurors indicated they had read or heard anything about the case." (Id., p. 69.) Trial counsel indicated that he would like to present evidence to support his motion and counsel proceeded to call Mr. Gannon as a witness. (Id., pp. 69 - 70.) After Mr. Gannon took the witness stand, the Court made the following inquiry of counsel:

Wait just a minute before we start taking evidence on this matter. Let me ask you, Mr. Keenan, lets just assume that everything you said is exactly true. How does this get to be the basis for a mistrial, if, in fact, none of theses jurors have seen any of this thing, know anything about it?

And you certainly had the opportunity to ask them anything you wanted to about it, anything about this trial. The Court did ask them if they knew anything about and they said no.

It seems to me we're going into a matter that could take some extended period of time to give you an opportunity to see what had occurred, if anything. But if everything you presented to the court did occur and we just take that, is that the basis for a mistrial; and if so, based upon what?

(Id., pp. 70 - 71.) Trial counsel acknowledged that he had no evidence or knowledge that the selected jury panel had seen or read the newspaper article. (Id., p. 71.) The trial court determined that the testimony of Mr. Gannon was unnecessary because even assuming the article was written and published by Mr. Gannon, there was no evidence to support a mistrial. (Id., pp. 71 - 75.)

Based on the foregoing, the undersigned disagrees that counsel used trial proceeding to "play a hoax" on Mr. Gannon. Although Mr. Gannon refers to his being called a witness as a "barrister's trick," trial counsel called Mr. Gannon as a witness to support his Motion for Mistrial. Thus, counsel was not deficient in attempting to present the testimony of Mr. Gannon to support such a motion. Moreover, there is no evidence that Petitioner was prejudiced by counsel's attempt to present Mr. Gannon as a witness. The Court notes that counsel's motion for a mistrial was conducted outside the presence of the jury. Accordingly, Petitioner has failed to establish either prong of the Strickland analysis.

### 2. Petitioner's claim that the prosecutor failed to provide exculpatory evidence to the grand jury.

Petitioner contends that "[t]he prosecutor's office committed prosecutorial misconduct when he failed to produce evidence that his office solicited that was favorable to the defendant before the

grand jury." (Document No. 52, p. 10.) Petitioner asserts that Mr. Gonzalez's statement "vindicated this petitioner but implicated Damien Bagut," but the statement was "never disclosed to the grand jury." (Id., p. 11.) Petitioner argues that Mr. Gonzalez's statement "would have shed a clearer light for the grand jury and this petitioner's level of involvement in the crime." (Id.)

In response, Respondent claims that the above claim "has not been exhausted nor was it included in the substance of the claims determined by this Court to be properly presented either for purposes of exhaustion or as sufficiently pled." (Document No. 57, p. 16.) Respondent further argues that (1) Petitioner has no constitutional right to grand jury review before trial, (2) defects in grand jury proceedings are rendered harmless following a conviction by jury, and (3) the government has no judicially enforceable duty to provide a grand jury with exculpatory evidence. (Id.)

After reviewing the record, the undersigned agrees that Petitioner failed to properly exhaust his claim that the prosecutor withheld exculpatory evidence in his grand jury presentation. Petitioner failed to raise the above issue in his State *habeas* petition or in his appeal of the Circuit Court's denial of *habeas* relief to the SCAWV.[16] (Document No. 23-2, Exhibits 5, 6, 8, 11, Document No. 33-2, and Document No. 37-2, Exhibit 12.) The record reveals that Petitioner raised the following grounds of prosecutorial misconduct in his *habeas* petition filed in the Circuit Court of Fayette County: (1) Unconstitutional failure to disclose evidence favorable to the defendant; (2) False statements made by prosecutor on record; (3) Prejudice statement made by prosecutor to prejudice jury; and (4) Not disclosing all inducements to witnesses. (Document No. 23-2, pp. 31 - 32, Exhibit

---

[16] The record reveals that Petitioner's *habeas* petition filed in the Circuit Court of Fayette County raised the following as grounds of prosecutorial misconduct: (1) Unconstitutional failure to disclose evidence favorable to the defendant; (2) False statements made by prosecutor on record; (3) Prejudice statement made by prosecutor to prejudice jury; and (4) Not disclosing all inducements to witnesses. (Document No. 23-2, pp. 31 - 32, Exhibit 5 and Document No. 33-2, p. 9.)

5 and Document No. 33-2, p. 9.) Petitioner had the opportunity to the raise the above issue in his State proceedings, but failed to do so. (Id.) Petitioner has not indicated, nor does the record suggest, any circumstance which hindered or impeded him from raising the aforesaid issue. Petitioner was represented and his requests for review of his conviction and sentence and the Circuit Court's denial of his Petition for *habeas* relief were submitted by counsel. The aforesaid issue must therefore be deemed procedurally defaulted or unexhausted and not properly before the District Court in this matter.

Even assuming the above claim not to be procedurally barred, Petitioner has failed to state a cognizable *federal* claim. The United States Supreme Court has clearly recognized that a valid indictment may not be challenged on the ground that a prosecutor failed to introduce exculpatory evidence to a grand jury. United States v. Williams, 504 U.S. 36, 112 S.Ct. 1735, 118 L.Ed.2d 352 (1992). Accordingly, Petitioner had no constitutional right to the presentation of exculpatory evidence to the grand jury.

**3.      Petitioner's claim that the trial court failed to credit him for time served.**

Petitioner argues that he "was denied 498 days of time served on his sentence that he had served during the extradition proceedings." (Document No. 52, p. 24.) Respondent contends that Petitioner fails to provide any documentation or controlling authority to support Petitioner's claim that he is entitled to credit for time served "while fighting extradition pursuant to an escape to another jurisdiction." (Document No. 57, p. 39.)

After reviewing the record, the undersigned finds that Petitioner failed to properly exhaust his claim that the trial court did not credit Petitioner for time served.[17] Based upon a thorough review of the record, it appears that Petitioner failed to raise the above issue in the following: (1) direct appeal, filed by counsel (Document No. 23-2, Exhibit 4.); (2) Amended and Supplemented Petition for Writ of *Habeas Corpus*, filed *pro se* (Document No. 33-2.); (3) "Losh List," signed by Petitioner and counsel (Document Nos. 23-2 and 26-2.), (4) Petition for Appeal, filed *pro se* (Document No. 26-3, pp. 5 - 8.), (5) Supplemental Petition for Appeal, filed by counsel (Document No. 37-2, Exhibit 10), and (6) Supplement Petition for Appeal, filed *pro se* (Document No. 37-2, Exhibit 11.). Although Petitioner raised the above issue in his initial *pro se* petition for *habeas* relief filed with the Circuit Court of Fayette County (Document No. 23-2, Exhibit 5.), Petitioner omitted the issue in all subsequent filings. Petitioner's claim that the trial court improperly denied him credit for time served was never presented to the State's highest Court on either direct or collateral review. Thus, the State Courts were not afforded "one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." See O'Sullivan, 526 U.S. at 845, 119 S.Ct. at 1732. Clearly, Petitioner had the opportunity to the raise the above issue in his State proceedings, but failed to do so. (Document No. 23-2, Exhibit 4, Document No. 26-2, Document No. 26-3, Document No. 33-2, and Document No. 37-2, Exhibits 10 and 11.) Furthermore, Petitioner has not indicated, nor does the record suggest, any circumstance which hindered or impeded him from raising the aforesaid issue. Petitioner was represented and his requests for review of his conviction and sentence and the Circuit Court's denial of his Petition for

---

[17]   Based upon a review of the record, it appears that the trial court granted Petitioner credit for 682 days. (Document No. 23-2, Exhibit 3.)

*habeas* relief were submitted by counsel. The aforesaid issue must therefore be deemed procedurally defaulted or unexhausted and not properly before the District Court in this matter.

**B.**     **Ineffective Assistance of Counsel.**

The standards established by the United States Supreme Court in determining whether or not a defendant was denied his Sixth Amendment right to effective assistance of counsel are set forth in Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Ineffective assistance of counsel claims consist of mixed questions of fact and law. Id. Under the two-pronged standard, a Petitioner must show (1) that counsel's performance was so deficient that it fell below an objective standard of reasonableness, and (2) that counsel's deficiency resulted in prejudice so as to render the results of the trial unreliable. Id. at 687-91, 104 S.Ct. at 2064-66. Counsel's performance is entitled to a presumption of reasonableness and judicial review of counsel's strategic decisions is highly deferential. Id. at 689, 104 S.Ct. at 2065. Thus, a petitioner challenging his conviction on the grounds of ineffective assistance must overcome a strong presumption that the challenged actions constituted sound trial strategies. Id. The Court in Strickland cautioned against the ease in second-guessing counsel's unsuccessful assistance after the adverse conviction and sentence are entered. Id. The Fourth Circuit Court of Appeals specifically recognized that ineffective assistance of counsel may not be established by a "Monday morning quarterbacking" review of counsel's choice of trial strategy. Stamper v. Muncie, 944 F.2d 170, 178 (4th Cir. 1991), cert. denied, 506 U.S. 1087 (1993). Applying this standard, and based upon all of the evidence of record, the Court will address the merits of each of Petitioner's allegations of ineffective assistance of counsel.

**1.      Counsel was not ineffective in failing to investigate.**

Petitioner contends that his trial counsel failed to investigate "all prosecution and potential defense witnesses." (Document No. 52, p. 5.) Specifically, Petitioner alleges that "[c]ounsel failed to investigate the whereabouts of Miguel Gonzalez to procure him as a witness," and "failed to review any of the statements made by any of the witnesses for the State." (Id., pp. 5 - 6.) Petitioner contends that Mr. Gonzalez was a "potentially vindicating witness," who would have testified to the following: (1) "[H]ow this Petitioner angrily interrogated Mr. Bagut as to what had occurred that made him shoot the victim;" (2) "[H]ow this Petitioner told Bagut he was not going to have anything to do with the crime;" and (3) "[H]ow this Petitioner refused to assist Gonzalez and Bagut with the cleaning of the blood or disposing of the body." (Document No. 58, p. 6.) Petitioner argues that Mr. Gonzalez was the "only other eye witness" and "[f]rom the content of his statement and the nature of his testimony, there is no doubt that the outcome of the case would have been different." (Document No. 52, p. 6.)

In response, Respondent argues that "Petitioner has failed to demonstrate what additional witnesses would have altered the outcome of the proceedings." (Document No. 57, p. 12.) Respondent notes that Mr. Bagut testified "extremely favorably to Petitioner going so far as to testify that Petitioner was not involved in the shooting of the victim or participated in the ensuing cover up." (Id.) Respondent further contends that "Petitioner has not presented any evidence that rebuts the presumption that the findings of the West Virginia Supreme Court are correct." (Id.) The SCAWV found as follows:

> Appellant ardently argues that the in-person testimony of Mr. Gonzalez "exonerating . . . [Appellant] would have been very powerful" and would likely have made a

38

change in the outcome of the case. While Mr. Keenan acted unreasonably, we are simply not convinced that his conduct prejudiced the outcome of Appellant's case. Nothing in the record indicates the exact whereabouts of Mr. Gonzalez since the time he had been released in 1998 from custody for his involvement as an accessory to the murder. Furthermore, even if he had been located, we are not convinced of the probability that his testimony would have added anything to Appellant's defense. It is not contested that Mr. Gonzalez was asleep at the time the gunshots were fired and he did not witness any of the shooting. Damien Bagut, who did testify at trial, indicated that he fired all of the shots and the Appellant had not assisted with the removal of the body from the murder scene. Appellant repeated this rendition of what occurred during his trial testimony. Mr. Gonzalez had nothing more to offer in the way of testimony and actually saw less of what had occurred during the course of the crime. Moreover, while the statement given to police by Mr. Gonzalez was not admitted into evidence, his testimony at the juvenile proceeding about the events surrounding the murder was admitted and the jury had the benefit of the information to reach its verdict. We do not find it likely that Mr. Gonzalez's in-person testimony at trial would have been more persuasive to the jury.

State ex rel. Quinones v. Rubenstein, 218 W.Va. at 395, 624 S.E.2d at 832.

Trial counsel "has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." Strickland, 466 U.S. at 691, 104 S.Ct. at 2066. When trial counsel did not make an investigation, his decision "must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." Id. In determining the reasonableness of counsel's actions, consideration may be given to "the defendant's own statements or actions." Id.

Without determining whether trial counsel's performance was deficient, the undersigned agrees with the SCAWV and finds that Petitioner has not demonstrated that he was prejudiced by counsel's failure to procure Mr. Gonzalez as a witness. According to Petitioner, Mr. Gonzalez was the "only other eye witness" who could testify concerning Petitioner's reaction following the shooting and Petitioner's refusal to assist in disposing of the victim's body. (Document No. 58, p. 6.) During the underlying criminal trial, Mr. Bagut testified that he was the sole shooter and verified

39

that Petitioner did not assist in disposing of the victim's body. (Document No. 57, Exhibit 18, pp. 50 - 56.) Both Mr. Bagut and Petitioner testified that Mr. Gonzalez was asleep in an adjacent room and did not witness the shooting. (Id., pp. 50 and 95.) Clearly, Mr. Gonzalez was not an "eye witness" to the shooting and could offer no evidence concerning whether Petitioner shot the victim. Although Mr. Gonzalez's testimony may have corroborated that Petitioner was upset following the shooting and refused to help dispose of the victim's body, the credibility determination remained with the jury. Accordingly, Petitioner has not met his burden of rebutting by clear and convincing evidence, the presumption of correctness of the State *habeas* court's factual findings, as required by 28 U.S.C. § 2254(e)(1).

The undersigned finds that Petitioner's generalized claim that trial counsel was ineffective in his failure to investigate potential witnesses to be without merit. Specifically, Petitioner alleges that "[c]ounsel failed to review any of the statements made by any of the witnesses for the State" and "there is no competent attorney who would not investigate all witnesses to ensure there is no element of surprise." (Document No. 52, p. 6.) Petitioner, however, fails to demonstrate what the result of such an investigation would have revealed, and how it would have altered the outcome of the verdict. See Bassette v. Thompson, 915 F.2d 932, 940 - 41 (4th Cir. 1990)(an allegation that an attorney conducted an inadequate investigation does not warrant relief absent a proffer of the specific favorable evidence the investigation would have brought out). The undersigned has conducted a thorough review of the omnibus hearing and trial transcripts. Although it appears that trial counsel did not personally interview the State's witnesses, counsel testified that his private investigator interviewed the witnesses and counsel reviewed their statements. (Document No. 48, Exhibit 15, pp. 20, 32, 71 - 72.) Further, there is no evidence that trial counsel was "surprised" by

40

the testimony of any witness. The record reveals that trial counsel was fully aware of the facts of the

case and was able to examine and cross-examine witnesses effectively. Accordingly, Petitioner's

claim should be dismissed because he has not demonstrated that he was prejudiced by counsel's

failure to investigate any witness.

### 2.    Counsel was not ineffective in failing to file pretrial motions.

Petitioner alleges that "[c]ounsel failed to file any pretrial motions or renew a request for all

available discoveries from the prosecutor's office." (Document No. 52, p. 7 and Document No. 58,

p. 7.) Respondent contends that Petitioner's "blanket assertion" that trial counsel was ineffective in

failing to file pretrial motions is insufficient to demonstrate a claim of ineffective assistance of

counsel. (Document No. 57, p. 13.) Respondent argues that Petitioner must "cite to a specific pretrial

motion not made by trial counsel then demonstrate how trial counsel's failure to make the motion

prejudiced the outcome of the trial by calling the reliability of the verdict into question." (Id.) The

SCAWV found as follows:

> Mr. Keenan explained at the habeas proceeding that he had discussed with
> Mr. Harrington the pretrial motions which had been filed regarding the exclusion of
> evidence and lineup identification. Mr. Keenan said that he determined after further
> consultation with the prosecution that evidence of other crimes would not be
> advanced so there was no need to pursue Mr. Harrington's motion to exclude
> evidence. We note that the trial record reflects that other crimes evidence was not
> introduced. As to the lineup identification motion, Mr. Keenan testified at the habeas
> hearing that as a result of his review of the case he believed pursuing the motion
> would be fruitless. We have no basis on which to find these tactical decisions
> unreasonable under the circumstances.

State ex rel. Quinones v. Rubenstein, 218 W.Va. at 394, 624 S.E.2d at 831.

Petitioner has failed to provide any evidence rebutting the SCAWV's findings of fact and

conclusions of law, which are presumptively correct. Without determining whether trial counsel's

performance was deficient, the undersigned finds that Petitioner has not demonstrated that he was

prejudiced by counsel's failure to file or renew the pretrial motions. Based on a review of the record, it appears that Petitioner's former trial counsel, Travers R. Harrington,[18] filed two pretrial motions: Motion to Exclude Evidence, and Motion for Lineup Identification. Mr. Keenan was subsequently appointed to the case and failed to pursue the above pretrial motions. Petitioner does not allege that the pretrial motions would have been granted, but merely argues that counsel was ineffective in failing to renew or file the motions. Based upon a review of the record, it is clear that "other crimes" evidence was not admitted in the underlying criminal trial. Thus, Petitioner was not prejudiced by counsel's failure to pursue the Motion to Exclude Evidence. During the omnibus hearing, trial counsel stated that he did not pursue the Motion for Lineup Identification because he believed the motion to be fruitless. The undersigned notes that counsel is not ineffective in failing to pursue motions lacking in merit. See United States v. Tart, 877 F.2d 61 (4th Cir. 1989)(unpublished opinion)(Stating that "[t]rial counsel is not per se ineffective merely because he failed to file a particular motion allowed under the rules of criminal procedure. There should be a good-faith basis for any motion filed in a court.") Thus, the SCAWV's decision was neither unreasonable nor contrary to federal law.

### 3.  Counsel did not fail to subject the State's case to meaningful adversarial testing.

Petitioner contends that "[c]ounsel failed to subject the State's case to meaningful adversarial testing in light of impeachment evidence against State witnesses Heather Taylor and Diane Green." (Document No. 52, p. 8.) Petitioner alleges that counsel should have impeached Ms. Taylor and Ms. Green based upon information provided to the private investigator. (Id.) Petitioner avers that Ms.

---

[18]  Mr. Harrington was appointed and represented Petitioner in his juvenile proceeding, the transfer hearing, and the adult criminal case until December 13, 1999, at which time James W. Keenan was appointed as counsel for Petitioner. (Document No. 23-2, p. 37.)

Taylor and Ms. Green told the private investigator that "deputy sheriffs threatened to take their children if they did not cooperate" and "they were never told anything directly by any of the defendants." (Id.) In response, Respondent argues that this issue was specifically addressed by the SCAWV and Petitioner has not presented argument or evidence compelling enough to rebut the presumption of correctness. (Document No. 57, p. 15.) The SCAWV found as follows:

> In this regard, Appellant points specifically to counsel's inability to succeed in having the Gonzalez statement admitted into evidence and charges that Mr. Keenan's cross examination of the State's witnesses was inadequate. We find no merit in this claim. The record reflects that Mr. Keenan repeatedly tried to have the Gonzalez statement introduced as evidence but the trial judge ultimately ruled that the statement was not made under oath and was not trustworthy as the testimony of Mr. Gonzalez during a court proceeding. We have no reason to conclude that the inability to convince the trial court to allow the out-of-court statement to be admitted into evidence was due to defense counsel's substandard performance. Likewise, our review of the trial transcript does not reveal that Mr. Keenan was in any way ill-prepared in his cross-examination of the State's material witnesses. Furthermore, as we previously observed in *State ex rel. Daniel v. Legursky*, 195 W.Va. 314, 465 S.E.2d 416 (1995), "[t]he method and scope of cross-examination 'is a paradigm of the type of tactical decision that [ordinarily] cannot be challenged as evidence of ineffective assistance of counsel.' *Hutchins v. Garrison*, 724 F.2d 1425, 1436 (4th Cir. 1983), *cert. denied*, 464 U.S. 1065, 104 S.Ct. 750, 79 L.Ed.2d 207 (1984)."

State ex rel. Quinones v. Rubenstein, 218 W.Va. at 395-96, 624 S.E.2d at 832-33.

During the underlying criminal trial, Ms. Green and Ms. Taylor testified that on the drive to New York they overheard a conversation between Petitioner, Mr. Bagut, and Mr. Gonzalez. (Document No. 57, Exhibit 17, pp. 14 and 102.) According to Ms. Green and Ms. Taylor, the three individuals discussed the shooting and indicated that Petitioner had shot the victim. (Id.) During direct examination, Ms. Taylor admitted that the above individuals were speaking in Spanish at times. (Id., Exhibit 16, pp. 179 - 80.) Trial counsel cross-examined Ms. Taylor regarding the possibility that she was mistaken as to which individual was speaking and what was actually said. (Id., Exhibit 17, p. 14.) Ms. Taylor admitted that she had met Petitioner and Mr. Gonzalez only twice

and that all three individuals "speak similarly."[19] (Id., p. 11 and 14.) Ms. Taylor indicated during cross-examination that she had not heard "anything during all of this trip of any voice that you could interpret to be Miguel Quinones that he had planned or schemed or deliberated with anyone or an expression of his own that he planned, schemed, deliberated to kill Chris Reardon."(Id., p. 18.) Counsel further cross-examined Ms. Taylor by referring to her June 20, 1995, statement to Trooper Sage, and to her December 8, 1995, testimony. (Document No. 57, Exhibit 17, pp. 7 - 8, 13, 18.) Additionally, trial counsel cross-examined Ms. Green by referring to her June 20, 1995, statement to Deputy Sheriff H. M. Canterbury. (Id., pp. 98 - 100.) Counsel extensively cross-examined Ms. Green concerning her testimony that Mr. Bagut stated that Petitioner was present in the kitchen when the first shot was fired. The following testimony was presented:

> Q     You told Deputy Sheriff Canterbury that, during this conversation that you heard in the vehicle, - -
>
> A     Yes, sir.
>
> Q     - - that "Damien said he shot him first. Then the guy got up and started running toward Mike. And something happened to Mike's gun, and it wouldn't go off, so Mike started running. Then he got his gun fixed and shot the guy in the face." Is that correct?
>
> A     Exactly. Yes, sir.

---

[19] The following testimony was presented:
Q     You had met Damien on several occasions before then?
A     Yes.
Q     So is it safe to say that you recognized his voice?
A     Yes.
Q     But the other two teenagers, Quinones and Gonzalez, this was the second time you'd ever laid eyes on them, is that correct?
A     Yes.
Q     They all speak similarly, don't they?
A     Yes.
      (Document No. 57, Exhibit 17, p. 14.)

Q       You weren't told, were you, by Damien or anyone else, who was in the room when Damien first shot Reardon, were you?

A       He - - him and - - he had - - the conversation, him and Mike was in the room when it happened.

Q       Okay. You didn't tell Deputy Canterbury that, did you?

A       By my statement right there, yeah.

Q       Okay. I'm going to hand you your statement. . . . . .

Q       And I want you to look that statement over, and I want you to tell the Court, and the jury and me where in that statement you told Deputy Canterbury that Mr. Quinones was in the room when the shooting started.

A       The statement that you just read back to me. "Damien said he shot him first, and the guy got up and started running towards Mike," meaning they were all, you know, - - I mean, it may not specify - - you know, I - - but that's what that means. They were all there together.

Q       Okay. That's what you understood it to mean. But they didn't discuss time, did they?

A       No, sir. . . . . . .

Q       You just - - you just inferred their comments to be that he was in the room when it started.

A       Yes, sir.

(Id., pp. 99 - 100, 102.) Counsel then presented Mr. Bagut and Petitioner as witnesses in an attempt to undermine the credibility of Ms. Taylor and Ms. Green. (Id., Exhibit 18, pp. 56 and 99.) Mr. Bagut testified as follows:

Q       Did you at any time tell anyone that Miguel Quinones shot Mr. Reardon?

A       No, sir.

Q       Did you hear Mr. Quinones tell anyone that he had shot Mr. Reardon?

A       No, sir.

45

(Id., p. 56.) Additionally, counsel questioned Petitioner as follows:

> Q      Miguel, you have heard these two young women offer their testimony under oath that there were conversations that two people shot Mr. Reardon, have you not?
>
> A      Yes, I have.
>
> Q      Did you say such a thing?
>
> A      No, I did not. I did not say nothing to the effect where I had involvement in the shooting of Mr. Reardon. I truly believe that there were confused in what they heard.

(Id., p. 99.)

The undersigned finds that Petitioner has failed to provide any evidence rebutting the SCAWV's findings of fact and conclusions of law, which are presumptively correct. The SCAWV properly applied the standards set forth in Strickland in its determination that counsel was not ineffective. Decisions on what evidence to use and the extent of cross-examination are questions of strategy for trial counsel. An attorney's strategic decision is presumed reasonable and protected from second guessing under Strickland. Based upon a review of the record, the undersigned finds that trial counsel's cross-examination was a tactical decision that was consistent with counsel's reasonable trial strategy of showing that Ms. Taylor and Ms. Green were confused or mistaken in their knowledge of the events surrounding the shooting. Counsel thoroughly cross-examined Ms. Taylor and Ms. Green and presented several witnesses in an attempt to undermine their credibility. Counsel emphasized during cross examination that Ms. Taylor and Ms. Green's knowledge of the shooting was based solely upon a conversation they overheard on the drive to New York. Trial counsel's decision not to cross-examine Ms. Taylor and Ms. Green concerning their statement to a private investigator that the "authorities had threatened to take their children away should they not cooperate with them" was a reasonable tactical decision, and thus, does not constitute ineffective assistance

46

of counsel. Petitioner further has not shown that counsel's cross-examination prejudiced the outcome of his trial. Therefore, Petitioner's claim should be dismissed because the SCAWV's decision was neither unreasonable nor contrary to federal law.

## C.   Exculpatory Evidence.

Petitioner alleges that the prosecutor improperly withheld Mr. Gonzalez's out-of-court statement. (Document No. 52, p. 10.) Petitioner claims that Mr. Gonzalez's "statement was a 57 page confession of events that transpired immediately after the initial shots were fired that killed the victim," which was given by Mr. Gonzalez in connection with his plea to "accessory after the fact." (Id.) Petitioner avers that the "exculpatory nature of the Gonzalez Statement is unquestionable." (Document No. 58, p. 10.)

In his response, Respondent argues that "none of the elements of a Brady violation are present in this claim." (Document No. 57, p. 17.) Respondent states that the "state ultimately provided the defense with the evidence, defense counsel was able to review it, and trial counsel was able to move for its admission into evidence." (Id.) Therefore, Respondent argues that "[b]ecause the evidence was ultimately provided to the defense and available to be moved as evidence at trial, there can be no violation of Brady or further analysis thereunder for materiality." (Id.) The SCAWV described the above statement as follows:

> The document was a multi-page statement of Miguel Gonzalez to the police regarding events surrounding the murder, cover-up and flight to New York. The statement indicated that Appellant had not shot the victim, was not the person who placed the bag on the victim's head and did not move the body to the van or otherwise assist in removing the body from the scene. The record shows that Mr. Keenan did not discover the importance of the Gonzalez statement until the day of trial when Appellant presented a few pages of the statement, obtained from an undisclosed source, to Mr. Keenan. The trial court appropriately granted a continuance allowing defense counsel time to review the information, but Mr. Keenan did not subpoena Mr. Gonzalez and chose instead to attempt to have the

47

statement admitted into evidence during the trial, which proved unsuccessful. Appellant contends that due to Mr. Keenan's inadequate investigation his defense was weakened because a vital witness was not procured to testify at trial. . . . Moreover, while the statement given to police by Mr. Gonzalez was not admitted into evidence, his testimony at the juvenile proceeding about the events surrounding the murder was admitted and the jury had the benefit of that information to reach its verdict.

State ex rel. Quinones v. Rubenstein, 218 W.Va. at 395-96, 624 S.E.2d at 832-33.

It is well established that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution. Brady v. Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196-97, 10 L.Ed.2d 215 (1963). In United States v. Agurs, 427 U.S. 97, 111, 96 S.Ct. 2392, 2401, 49 L.Ed.2d 342 (1976), the Supreme Court clarified the prosecutor's duty to require disclosure of favorable evidence to the defense, even if not requested. This duty encompasses impeachment evidence, exculpatory evidence, and evidence "known only to police investigators and not to the prosecutor." Kyles v. Whitley, 514 U.S. 419, 438, 115 S.Ct. 1555, 1567-68, 131 L.Ed.2d 490 (1995). However, a prosecutor does not have a "constitutional duty routinely to deliver his entire file to defense counsel." United States v. Agurs, 427 U.S. at 111, 96 S.Ct. at 2401. If the prosecution suppresses Brady material, the disclosure of which would have in all reasonable probability resulted in a different outcome, then the mandates of due process are violated. See United States v. Bagley, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985); Brady v. Maryland, 373 U.S. at 87, 83 S.Ct. at 1196-97. To state a valid Brady claim therefore, the evidence "must be favorable to the accused, either because it is exculpatory, or because it is impeaching, [the] evidence must have been suppressed by the State, either willfully or inadvertently," and the evidence must have been material to the verdict such that its suppression prejudiced the defense. Strickler v.

48

Greene, 527 U.S. 263, 281-82, 119 S.Ct. 1936, 1948, 144 L.Ed.2d 286 (1999); Monroe v. Angelone,

323 F.3d 286, 299-300 (4th Cir. 2003). However, "when the claim is one of delayed disclosure

rather than complete suppression . . . [the Court] need not reach the question whether the evidence

at issue was 'material' under Brady unless the defendant first can show that defense counsel was

'prevented by the delay from using the disclosed material effectively in preparing and presenting

the defendant's case.'" United States v. Lemmerer, 277 F.3d 579, 588 (1st Cir.), cert. denied, 537

U.S. 901, 123 S.Ct. 217, 154 L.Ed.2d 173 (2002)(quoting United States v. Ingraldi, 793 F.2d 408,

411-12 (1st Cir. 1986)).

> The "principal concern" in such cases is "whether the failure to supply the information in a seasonable fashion caused the defense to change its trial strategy." *United States v. Joselyn*, 99 F.3d 1182, 1196 (1st Cir. 1996). Thus, the defendant must show that "learning the information altered the subsequent defense strategy and [that], given timeous disclosure, a more effective strategy would likely have resulted." *United States v. Devin*, 918 F.2d 290 (1st Cir. 1990). He cannot rely on wholly conclusory assertions but must bear the burden of producing, at the very least, a prima facie showing of a plausible strategic option which the delay foreclosed." *Id.*

Lemmerer, 277 F.3d at 588.

After reviewing the transcripts of the criminal trial and omnibus hearing, the undersigned

finds that Mr. Gonzalez's out-of-court statement was not withheld from Petitioner or trial counsel.[20]

(Document No. 48, Exhibit 15, pp. 9 and 44.) Therefore, Petitioner claim is an issue of delayed

disclosure and the Court need not determine whether the evidence was material. The relevant inquiry

is whether the defendant was able to effectively use the exculpatory information. Petitioner has

failed to demonstrate that the delay in disclosure of Mr. Gonzalez's statement impeded his ability

---

[20] During the omnibus hearing, Petitioner testified that he became aware of the statement in July, 2000, "through contact with Damien Bagut's family" and "three pages of [the statement] was forwarded to me." (Document No. 48, Exhibit 15, p. 44.)

to prepare and present his defense. The record reveals that counsel was provided with a copy of the statement prior to trial, and a continuance was granted to allow counsel time to review the statement.[21] (Document No. 48, Exhibit 15, p. 9.) Counsel clearly had the opportunity to review the statement prior to trial.[22] During the underlying criminal trial, counsel zealously argued that Mr. Gonzalez's out-of-court statement should be admitted into evidence under Rule 804(b)(5) of the West Virginia Rules of Evidence. (Document No. 57, Exhibit 18, pp. 31 - 43.) Although the trial court ultimately found that Mr. Gonzalez's out-of-court statement was inadmissible, the undersigned finds that the delay in disclosure did not prevent Petitioner from effectively using the information because Petitioner was clearly aware of the statement prior to trial. Furthermore, Petitioner's defense strategy was not altered. Petitioner's defense strategy before and after receiving Mr. Gonzalez's out-of-court statement was that Petitioner did not shoot the victim and did not assist in disposing of the victim's body. Accordingly, the delayed disclosure does not rise to the level of a constitutional violation.

Furthermore, the undersigned finds that the substance of Mr. Gonzalez's out-of-court statement was not such that it determined the guilt or innocence of Petitioner and its suppression did not prejudice the defense. Petitioner alleges that the "exculpatory nature of the Gonzalez Statement is unquestionable" because Mr. Gonzalez's was an "eye witness." (Document No. 58, p. 10.) As discussed earlier, it is undisputed that Mr. Gonzalez was asleep in another room at the time of the

---

[21]   Trial counsel testified as follows:
"Mr. Quinones informed me contemporaneous with trial, or right before trial, that he had received three pages of a statement. I told him that I did not have such a statement. I addressed it with Mr. Harris, and Mr. Harris produced a copy of it. (Document No. 48, Exhibit 15, p. 9.)

[22]   In arguing for the admission of Mr. Gonzalez's statement, counsel stated that "I have viewed that testimony, and I viewed this statement." (Document No. 57, Exhibit 18, p. 32.)

shooting and did not witness the murder. Mr. Bagut, however, presented significant exculpatory evidence testifying that he was the sole shooter. (Document No. 57, Exhibit 18, pp. 50 - 54.) Moreover, Mr. Gonzalez's testimony at the juvenile proceedings concerning events surrounding the shooting was admitted into evidence. (Id., pp. 79 - 80.) Thus, the disclosure of Mr. Gonzalez's out-of-court statement was cumulative. Therefore, Petitioner's claim should be dismissed because he has failed to establish a Brady violation, and the State habeas court's findings are entitled to a presumption of correctness.

**D.**    **Prosecutorial Misconduct.**

With respect to claims of prosecutorial misconduct, federal habeas review is available only upon a showing that the prosecutor's remarks were improper and that the remarks "prejudicially affected the defendant's substantial rights so as to deprive the defendant of a fair trial." United States v. Mitchell, 1 F.3d 235, 240 (4th Cir. 1993)(internal citations omitted). The test is whether the prosecutor's remarks "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Darden v. Wainwright, 477 U.S. 168, 181, 106 S.Ct. 2464, 2471-72, 91 L.Ed.2d 144 (1986)(quoting Donnelly v. DeChristoforo, 416 U.S. 637, 643, 94 S.Ct. 1868, 1871-72, 40 L.Ed.2d 431 (1974).). The fact that the comments are "undesirable or even universally condemned" is insufficient to establish a due process violation. Id. In determining whether the prosecutor's comments denied the defendant of a fundamentally fair trial, the Court should consider the following factors: "(1) the nature of the comments, (2) the nature and quantum of the evidence before the jury, (3) the arguments of opposing counsel, (4) the judge's charge, and (5) whether the errors were isolated or repeated." Arnold v. Evatt, 113 F.3d 1352, 1358 (4th Cir. 1997), cert. denied sub nom., Arnold v. Moore, 522 U.S. 1058, 118 S.Ct. 715, 139 L.Ed.2d 655 (1998); see also United

States v. Harrison, 716 F.2d 1050, 1052 (4th Cir. 1983), cert. denied sub nom.Wissler v. United States, 466 U.S. 972, 104 S.Ct. 2345, 80 L.Ed.2d 819 (1984). The Court must not review the prosecutor's comments in isolation. Rather, the remarks must be reviewed in context of the entire proceedings to determine whether the comments violated the defendant's right to a fundamentally fair trial. See Mitchell, 1 F.3d at 240; United States v. Young, 470 U.S. 1, 11, 105 S.Ct. 1038, 1044, 84 L.Ed.2d 1 (1985)("[A] criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statements or conduct must be viewed in context; only by so doing can it be determined whether the prosecutor's conduct affected the fairness of the trial.").

### 1.    Prosecutor's comment to the press did not deprive Petitioner of a fair trial.

Petitioner alleges that "[t]he prosecutor's office committed prosecutorial misconduct when he gave information to a newspaper in violation of the ABA Code of Professional Conduct." (Document No. 52, p. 11.) Specifically, Petitioner contends that an article was published the morning of his trial where the "prosecutor was quoted as saying 'Reardon was murdered execution style,' 'Reardon's body was found riddled with bullets,' 'because Quinones committed the crime as a juvenile." (Id.) Petitioner states that "[t]his act by the prosecutor was strategic and was done with malice in order to prejudice the proceedings." (Document No. 58, p. 11.)

Respondent argues that Petitioner fails to allege "how the comments of the prosecutor to the press rendered his trial fundamentally unfair."(Document No. 57, p. 19.) Respondent contends that inflammatory comments made by a prosecutor to the press are insufficient, standing alone, to demonstrate prosecutorial misconduct. (Id., p. 18.) Respondent states that the challenged comments were made to the media, and "statements of the prosecutor cannot be held to have prejudiced the

outcome of the trial unless they were made during the course of the trial." (Id.) Further, Respondent

argues that there is no evidence that any juror was exposed to the comments prior to or during the

trial. (Id.)

Without determining whether the prosecutor's conduct was improper, the undersigned finds

that Petitioner fails to show how the prosecutor's comment to the media prejudicially affected his

substantial rights so as to deprive him of a fair trial. See Mitchell, 1 F.3d at 240. Petitioner does not

allege or demonstrate that the jurors who presided over his case were actually biased against him

as a result of any pretrial publicity. See United States v. Dozier, 672 F.2d 531, 545 (5th Cir. 1982)(a

federal court cannot order a new trial because of media accounts of a prosecutor's pretrial statements

that have produced no proven prejudice to the defendant). The prosecutor's comment to the press

occurred prior to the empaneling of the jury, and voir dire of the jury included questioning

concerning pretrial publicity. (Document No. 57, Exhibit 16, pp. 6 - 7.)There was no indication that

the jury viewed or even knew of the newspaper article. Accordingly, Petitioner's prosecutorial

misconduct claim should be dismissed because Petitioner has not demonstrated that prosecutor's

conduct "so infected the trial with unfairness as to make the resulting conviction a denial of due

process."

## 2. Prosecutorial misconduct did not result from prosecutor's alleged perjury.

Petitioner claims that the prosecutor committed perjury when making his argument

concerning the admission of Mr. Gonzalez's out-of-court statement. (Document No. 52, pp. 11 - 12.)

Specifically, Petitioner argues that the prosecutor "testified in open court that he did not feel as

though Miguel Gonzalez was being truthful when he gave his statement." (Id., p. 12.) Petitioner

contends that "the prosecutor had a duty to be truthful regarding the circumstances behind the taking

53

of the statement of Mr. Gonzalez." (Document No. 58, p. 12.)

Respondent argues that prosecutor's statement during the bench conference did not "so infect the trial with unfairness as to make the resulting conviction a denial of due process." (Document No. 57, pp. 19 - 21.) Respondent emphasizes that the prosecutor was not "testifying" and the comments were not made in the presences of the jury. (Id., p. 20.) Respondent contends that the prosecutor merely made a persuasive argument concerning the admissibility of Mr. Gonzalez's out-of-court statement. (Id.)

The undersigned finds that the prosecutor's argument concerning the admissibility of Mr. Gonzalez's statement does not constitute prosecutorial misconduct. In chambers, the following arguments were presented concerning the admissibility of Mr. Gonzalez's out-of-court statement:

> MR. KEENAN: This statement is specifically admissible under Rule 804(b)(5) of the West Virginia Rules of Evidence, Your Honor. The declarant is unavailable. It was taken under circumstances to verify its trustworthiness. It is critical to Mr. Quinones' defense. It involves explanations of the crimes, explanations of statements, perceptions of a co-defendant.
>
> THE COURT: Well, if Mr. Harris agrees with you, that will make it easy for the Court. But if he says that, well, - -
>
> MR. HARRIS: I don't think this was a statement against penal interest or that it - - which is what I assume Mr. Keenan is talking about it in terms of trustworthiness. Mr. Gonzalez was trying to paint a picture to that he could reach an agreement with the State on a plea, and it certainly was a - - to some extent, mostly a self-serving statement, in my opinion. It didn't really tell us anything we hadn't already heard; that he was asleep at the time this whole thing first came down, and he was awakened by the gunshots.
>
> There is, in fact, a more reliable document, which is the transcript of his testimony before the - - I believe, before Judge Hatcher on a transfer hearing. But this statement itself is simply a statement that was made in the sheriff's road

> office with his attorney present, myself and Officer Canterbury - - I don't recall whether anyone else was present or not - - for the purposes of trying to persuade the State to reach an agreement with him.

(Document No. 57, Exhibit 18, pp. 31 - 32.) The trial court then proceeded to allow defense counsel to present evidence to establish a foundation for the admission of Mr. Gonzalez's statement. (Id., pp. 36 - 41.) After hearing testimony from Deputy Canterbury, the trial court found that Mr. Gonzalez's out-of-court statement was "not trustworthy, doesn't come within the Rule and that the best evidence is the transcript of the hearing." (Id., p. 41.) First, the undersigned finds that the prosecutor's remark was not improper. The prosecutor was merely responding to the trial court's inquiry as to whether he agreed that Mr. Gonzalez's statement was trustworthy and admissible under Rule 804. Next, the prosecutor's remark that he believed Mr. Gonzalez's statement was not trustworthy did not "prejudicially affected the defendant's substantial rights so as to deprive the defendant of a fair trial." See Mitchell, 1 F.3d at 240. The prosecutor's statement was made outside the presence of the jury. Additionally, Mr. Gonzalez's statement concerning the events of June 19, 1995, was admitted through transcripts of Mr. Gonzalez's juvenile proceedings. (Document No. 57, Exhibit 18, pp. 79 - 80.) Accordingly, Petitioner claim should be dismissed because there is no evidence that the prosecutor engaged in misconduct by arguing that Mr. Gonzalez's out-of-court statement was inadmissible.

### 3. Prosecutor did not reference evidence not introduced at trial.

Petitioner asserts that "[d]uring the closing arguments the State gave the robbery theory to the jury regardless of the fact that the Court ruled that there was no evidence of this theory." (Document No. 52, p. 13.) Petitioner states that the trial court specifically held that there was no evidence to support a felony murder jury instruction. (Id., p. 12.) Petitioner contends that "the

prosecution argued that this Petitioner committed a robbery upon the victim, regardless of the trial court's previous ruling." (Document No. 58, p. 13.) Petitioner agues that "[t]here was no evidence that revealed that the victim had $6,000 on his person when he entered the residence of 212 Midway." (Id.) Further, Petitioner avers that the prosecutor improperly "relayed to the jury that a witness (Steve Dalton) testified that the victim had started on crack cocaine with 'these boys at 212 Midway.'" (Document No. 52, p. 13.)

In response, Respondent claims that the prosecutor did not argue for a conviction of felony murder during closing arguments. (Document No., 57, p. 21.) Additionally, Respondent claims that Petitioner "does not cite to one single, solitary word uttered by the prosecutor that brought in facts not in evidence." (Id., p. 22.) Respondent states that testimony was presented at trial concerning drug dealing by Petitioner and his co-defendants. (Id.) Finally, Respondent claims that "[a]ny reference by the prosecutor to the money supposedly held by the victim was no more than a commentary on evidence presented at trial." (Id.)

The remarks to which Petitioner objects are contained in the following portion of the prosecutor's closing argument:

> And the State doesn't deny that Chris Reardon was addicted to crack cocaine. His brother-in-law told you that, that he had started on crack cocaine with these boys at 212 Midway, back in - - I think it was February sometime. A horrible addiction. And he went down there to buy more. And he would have kept going down there to buy more, I suspect, had he lived.

(Document No. 57, Exhibit 19, p. 47.)

> The elements of the crime of murder in the first degree are premeditation and malice. And the Court has told you that those can be formed and must be formed prior to the killing, but there's no specified matter of time.
>
> He didn't have to sit down and plan, 'Hey, the next time Dennis Reardon comes here to the house, let's shoot him, take his money.' They didn't have to sit down and

56

plan that. That's something that can happen in an instant and happen very briefly. And I suggest to you that that's what happened that day and that this was premeditated first degree murder. Dennis Reardon came to the house to buy drugs, that he had $6,000 with him that day, not just the $80 that Damien Bagut talked about.

After all, he promised these girls a lot of money to take them to New York. He never produced any of it, other than maybe $70 for gasoline. And Mr. Keenan elicited from the young lady who drove up there that she'd been promised a lot of money.
Well, they needed some money to survive on once they got back to New York because their little business sitting over in Summerlee was gone. I submit to you they took that $6,000, or at least part of it, to go back to New York with.

Mr. KEENAN:          Objection.

THE COURT:          Overruled. They - - that's evidence. They can - - the jury can certainly weigh it for whatever purpose.

(Id., pp. 51 - 52.)

In view of the foregoing, the undersigned first finds that the prosecutor did not argue for a felony murder conviction in his closing argument. Next, the prosecutor did not act improperly by referencing testimony presented at trial in his closing argument. Several witnesses testified in the underlying criminal trial that they were aware that Petitioner and his co-defendants were dealing in drugs at the residence located at 212 Midway. (Id., Exhibit 16, pp. 123 - 24, Exhibit 17, pp. 8 - 9, Exhibit 18, pp. 69 - 70, 89, and 104.) The victim's brother-in-law, Mr. Dalton, testified that he and the victim had visited the residence at 212 Midway "about 60 times or more" for the purpose of purchasing crack cocaine. (Id., Exhibit 16, pp. 91, 101, and 105.) Mr. Dalton stated that when he last saw the victim, the victim was going to 212 Midway "to pick up some weight" and had $6,000 on his person. Mr. Dalton testified that the victim "had been dealing with the guys for crack cocaine for about four months prior to the killing." (Id., p. 103.) Additionally, Ms. Taylor testified that Mr. Bagut promised her "a large sum of money" to drive the three individuals to New York. (Id.,

Exhibit 17, p. 11.) Ms. Taylor stated that she never received the "large sum of money" and Detective Canterbury testified that there was no money recovered from the victim's body. (Id., Exhibit 16, p. 173 and Exhibit 17, p. 11.) Thus, the prosecutor's challenged comments were limited to closing argument and did not divert the jury's attention to extraneous matters. The prosecutor's challenged comments were merely fair inferences from the evidence and testimony presented at trial. United States v. Francisco, 35 F.3d 116, 120 (4th Cir. 1994)(stating that "closing argument is not merely a time for recitation of uncontroverted facts, but rather the prosecution may make fair inferences from the evidence"). Further, the weight of the evidence supported the jury's verdict, thereby reducing the likelihood that the prosecutor's comments influenced the jury's decision. The undersigned cannot find that the prosecutor's remarks violated the integrity of Petitioner's criminal proceedings or denied Petitioner due process. Therefore, Petitioner's above claim should be dismissed.

### 4.      Prosecutor did not refer to defense witnesses as "lairs."

Petitioner alleges that the prosecutor "referred to the defendant and his witnesses as liars." (Document No. 52, p. 13.) Specifically, Petitioner challenges the following statements:

> He stated to the jury "are they mistaken about what they recall on the way to New York, *or was this pure fabrication that you heard from this witness stand from Damien Bagut and this defendant*" . . . The prosecutor went further to ask the jury "what incentive did he [Bagut] have to come in her and *tell the truth or to help his friend*? . . . "Obviously, this defendant has something to lose if he gets on the witness stand and admits that he shot this fellow" . . . And at the time he [Gonzalez] gave his testimony, he knew he was going to be okay too. And I submit to you that these fellows were all trying to help themselves" . . . "Mr. Quinones would want you to think that he was just a poor victim in this whole thing . . . And again, you ladies and gentlemen are going to have to weigh those facts. *If you believe anyone testified falsely in this case about any material fact, you have a right to disregard all of their testimony*" . . . "*It's easy to get on the witness stand when you're facing the possibility of going to prison to tell the story the way you want to tell it*."

(Id., pp. 13 - 14.)(emphasis as added by Petitioner)

58

Respondent argues that Petitioner's claim that "it was prosecutorial misconduct for the prosecutor to portray the testimony of defense witnesses as suspect, false, fabricated, and untruthful" is frivolous. (Document No. 57, p. 23.) Respondent states that a prosecutor may "make reasonable inferences from the evidence" and "speculate on the truthfulness of a witness when evidence has been introduced that casts doubt on the veracity of that testimony." (Id.) Respondent contends that the "comments of the prosecutor on the credibility of the witnesses at trial was a fair inference from the evidence and no more." (Id.)

The undersigned has reviewed the trial transcript and finds nothing improper about the prosecutor's closing argument. The undersigned finds that the prosecutor did not improperly vouch for the credibility of the witnesses. Improperly vouching occurs when a prosecutor either (1) bluntly states a personal belief in a witness's credibility that places the prestige of the prosecutor's office behind that witness, or (2) implies that the witness's testimony is corroborated by evidence known to the government but not known to the jury. See United States v. Young, 470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985); United State v. Francis, 170 F.3d 546, 550 - 51 (6th Cir. 1999); United States v. Lewis, 10 F.3d 1086, 1089 (4th Cir. 1993). Absent such personal vouching, a prosecutor may fairly comment on the evidence. See United States v. Perez, 144 F.3d 204, 210 (2nd Cir. 1998)(approving use of "I submit" to urge the jury to reach certain conclusion without impermissibly interjecting the prosecutor's personal beliefs into the case); United States v. Catalfo, 64 F.3d 1070, 1080 (7th Cir. 1995), cert. denied, 517 U.S. 1192, 116 S.Ct. 1683, 134 L.Ed.2d 784 (1996)(prosecutor permitted to argue that jury should believe one witness over another); and United States v. Goodapple, 958 F.2d 1402, 1409 - 10 (7th Cir. 1992)(prosecutor may refer to a witness as a "lair" as long as the comment "reflect reasonable inference from the evidence adduced at trial

rather than personal opinion"). In the underlying criminal trial, the prosecutor merely pointed to inconsistency in the testimony. See United States v. Moore, 710 F.2d 157, 159 (4th Cir. 1983), cert. denied, 464 U.S. 862, 104 S.Ct. 192, 78 L.Ed.2d 169 (1983)(stating "[it] was of course permissible, indeed it was good trial advocacy, for the government to stress to the jury the inconsistencies and improbabilities in [the witness's] testimony"). Specifically, the prosecutor emphasized that the defense witnesses' version of the shooting were contradictory to the majority of the evidence. Clearly, the prosecutor was not indicating that he had personal knowledge, but was referring to the evidence presented at trial. The undersigned further notes that the jury was instructed that the comments of the lawyers were not evidence and were not to be considered as matters of fact, and jurors are presumed to follow the court's instructions. Moreover, in light of the evidence against Petitioner, Petitioner fails to establish that these comments were so prejudicial as to deprive them of a fair trial. Accordingly, Petitioner's above claim of prosecutorial misconduct should be dismissed.

### 5. Prosecutor's speculated on the consequence of a "not guilty" verdict.

Petitioner argues that the prosecutor's closing argument improperly speculated on the consequence of a "not guilty" verdict. (Document No. 52, p. 14 and Document No. 58, p. 18.) Specifically, Petitioner states that the prosecutor improperly stated the following concerning Mr. Bagut's testimony: "Is he going to take care of his buddy? If he can get his buddy off, can his buddy set up some other stuff for them when they get out?" (Document No. 52, p. 14.) Petitioner contends that "this remark was to tell the jury that if you don't convict you will be allowing Mr. Quinones to set up a drug operation to help his friend who just testified on his behalf." (Id.)

Respondent claims that the prosecutor's statement was "at most ill-advised." (Document No. 57, p. 26.) Respondent notes that trial counsel objected to the prosecutor's statement, and the trial court sustained the objection and instructed the jury to disregard the statement. (Id.) Respondent further contends that "[t]here was nothing in the comments made by the prosecutor that distorted the jury's ability to make a fair decision based on the evidence presented at trial." (Id., p. 27.)

The undersigned has reviewed the trial transcript and finds that Petitioner's claim must fail. The Court has reviewed the prosecutor's comment in context of the entire proceedings and finds that the comment did not violate Petitioner's right to a fundamentally fair trial. Although the prosecutor's comment may have been "ill-advised," a due process violation does not result from comments that are merely "undesirable or even universally condemned." Darden, 477 U.S. at 181, 106 S.Ct. at 2471-72. Further, the above comment was isolated, and not repeated. Absent other indications of prejudice or evidence of intentional prosecutorial misconduct, the trial court's instruction to the jury to disregard the prosecutor's comment was sufficient to cure any unfairness to defendant. (Document No. 57, Exhibit 20, p. 71.) In view of the evidence against Petitioner, Petitioner fails to establish that these comments were so prejudicial as to deprive them of a fair trial. The undersigned cannot find that the remarks violated the integrity of Petitioner's criminal proceedings or denied Petitioner due process. Accordingly, Petitioner's above claim should be dismissed.

### 6. Prosecutor did not improperly refer to Petitioner's ethnicity.

Petitioner asserts that the prosecutor "made several remarks [during closing arguments] that he knew would set the precedence of prejudice as to the defendant's place of geographical origin and ethnicity." (Document No. 52, p. 15.) Specifically, Petitioner challenges the following comments: "When they were on their way back to New York from whence they had come, thank

goodness," and "You'll recall one of the last things he said to this defendant before they came over here this morning – in Spanish of course." (Id.) Petitioner contends that "if his comment was not to inflame the passions of the jury against the defendant there would have been no reason to emphasize 'thank goodness' and 'of course.'" (Id.)

In response, Respondent claims Petitioner "fails to argue how the prosecutor's choice of words rendered the trial fundamentally unfair as required to demonstrate a claim of prosecutorial misconduct." (Document No. 57, p. 24.) First, Respondent contends that the prosecutor's statement of "thank goodness" and "of course" when referencing Petitioner, was not improper. Respondent states that "[i]f the prosecutor uttered 'of course' after noting the defendants were speaking in Spanish, that would indicate an acknowledgment of the obvious." (Id., p. 25.) Respondent also claims that the prosecutor was speculating on Petitioner's own reaction to leaving West Virginia for a safe haven of escape when the prosecutor made the "thank goodness" remark (Id.) Respondent further notes that "Petitioner's ethnicity was obvious to the jury." (Id., p. 26.) Finally, Respondent argues that "unless Petitioner can demonstrate that he was convicted solely for being a Hispanic New Yorker and that fact was brought to the attention of the jury solely on 'thank goodness' and 'of course,' this claim fails because there is utterly no evidence that anything the prosecutor said was improper." (Id.)

The undersigned has reviewed the trial transcript and finds nothing improper about the prosecutor's closing argument. The remarks to which Petitioner objects are contained in the following portion of the prosecutor's closing argument:

> Damien Bagut already has calculated his release from the penitentiary. He knows when he's going to get out. And I suggest to you that he was helping a friend. And you'll recall one of the last things he said to this defendant before they came over there that morning - - in Spanish, of course, - - was, "This is your day, man."

(Document No. 57, Exhibit 20, p. 48.)

> Ask yourself this question: When would Mr. Bagut, Mr. Quinones and Mr. Gonzalez have been more at ease and more truthful about what occurred at that house? When they were on their way back to New York from whence they had come, thank goodness, and to safety. And I believe Mr. Quinones testified he - - that he was going home, going back up where it was safe.

(Id., p. 50 - 51.) The undersigned finds that the prosecutor did not make prejudicial remarks concerning Petitioner's "place of geographical origin and ethnicity." Further, Petitioner fails to demonstrate that the prosecutor's remarks had a tendency to mislead the jury because Petitioner did speak Spanish and was from New York. In the underlying criminal trial, evidence was presented that Petitioner was from New York and occasionally spoke Spanish when speaking to the co-defendants. (Document No. 57, Exhibit 18, p. 89 and Exhibit 16, pp. 179 - 80.) Petitioner testified that he and Mr. Bagut had a conversation in Spanish prior to Mr. Bagut's testimony.[23] (Id., Exhibit 18, p. 100.) By stating "of course" Petitioner spoke Spanish to Mr. Bagut, the prosecutor was merely inferring that the individuals spoke Spanish so their communication would be confidential. During the underlying criminal trial, Petitioner also indicated that he wanted to return to New York following the shooting. (Document No. 57, Exhibit 18, pp. 98 - 99.) By stating "thank goodness" when referring to Petitioner's return to New York, the prosecutor was inferring that Petitioner was happy

---

[23] The following testimony was presented:

Q     Did you, sir, concoct any story or confer with Mr. Bagut in advance of his appearance today or your testimony today on what was to be said?

A     No, sir. Only - - the only talk that we had, I seen him this morning when we walked by, - - it was very brief - - and he asked me how I was doing, and I told him I was all right. And he said, "Well, this is your day." And that's it. That was - - that was what was spoken, because I remember they had made reference to what I had said in Spanish, and that' s what I said in Spanish.

(Document No. 57, Exhibit 18, p. 100.)

to have returned safely to New York. Thus, the prosecutor's challenged comments were merely fair inferences from the evidence and testimony presented at trial. United States v. Francisco, 35 F.3d at 120 (stating that "closing argument is not merely a time for recitation of uncontroverted facts, but rather the prosecution may make fair inferences from the evidence"). Additionally, the weight of the evidence supported the jury's verdict, thereby reducing the likelihood that the prosecutor's comments influenced the jury's decision. The undersigned cannot find that the remarks violated the integrity of Petitioner's criminal proceedings or denied Petitioner due process, therefore, Petitioner's above claim should be dismissed.

**E.     Error in Jury Composition.**

Petitioner alleges that the trial court committed error when it refused to strike Juror Dale Wagner for cause. (Document No. 52, p. 18.) Petitioner argues that Juror Wagner indicated that he could not be fair and unbiased because his children were killed by a drunk driver. (Id.) Specifically, Petitioner states that "Juror Wagner openly relayed his prejudice and openly deemed the Petitioner guilty of the charge before weighing the evidence." (Document No. 58, p. 19.) In response, Respondent contends that Petitioner has not overcome the presumption that the findings of the SCAWV are correct. (Document No. 57, p. 29.) The SCAWV found as follows:

> Appellant contends that the trial court committed error by refusing to strike two jurors from the jury panel for cause, thus requiring him to use two of his peremptory challenges to strike the jurors. One of these jurors during the course of years had retained the legal services of the county prosecutor and the assistant prosecutor assigned to the murder trial to address legal matters associated with his business. The other juror indicated he had serious concerns with people who use alcohol and drugs since both of his children had tragically died, one due to a drunk driver. Both jurors indicated upon individual questioning by the court that they could be fair and unbiased as jurors and the court denied defense counsel's motions to strike for cause. Appellant urges us to find that our holding regarding rehabilitation of jurors in O'Dell v. Miller, 211 W.Va. 285, 656 S.E.2d 407 (2002), should be applied to his case. We do not agree. In O'Dell we stated in syllabus point five that "[o]nce a

64

prospective juror has made a clear statement during *voir dire* reflecting or indicating the presence of a disqualifying prejudice or bias, the prospective juror is disqualified as a matter of law and cannot be rehabilitated by subsequent questioning, later retractions, or promises to be fair." We conclude from our careful review of the record that the matters the two juror candidates originally raised did not represent prejudice beyond question so as to indicate that they had a present and fixed view of the case. Without the demonstration of such disqualifying prejudice or bias, the rule in O'Dell is not implicated. We further note our holding in syllabus point seven of State v. Phillips, 194 W.Va. 569, 461 S.E.2d 75 (1995), in which we said:

> A trial court's failure to remove a biased juror from a jury panel does not violate a defendant's right to a trial by an impartial jury as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and by Section 14 of Article III of the West Virginia Constitution. In order to succeed in a claim that his or her constitutional right to an impartial jury was violated, a defendant must affirmatively show prejudice.

Failing to find the requisite showing of prejudice demonstrated in this case, we find no error on which to grant relief in habeas corpus.

State ex rel. Quinones v. Rubenstein, 218 W.Va. at 396, 624 S.E.2d at 833.

The undersigned agrees with the trial court and SCAWV that Juror Wagner was a fair and unbiased juror. According to the trial transcript, Juror Wagner indicated that he had concern with people who used alcohol because his daughter was killed by a drunk driver and "to me, if someone's drunk and killing with a car, he murdered him." (Document No. 57, Exhibit 16, p. 26.) To determine Juror Wagner's ability to serve, the trial judge conducted individual questioning as follows:

THE COURT:        Mr. Wagner, let me ask you, do you think that you could listen to this evidence here that comes in here this case, the witnesses on the witness stand, and the instructions of the Court, and base your decision on what you hear, and how the Court instructs you?

MR. WAGNER:       Yes, I think I could. But the only reason I mentioned is, like I said, when I got to the doctor, my wife says, "Now, don't go in there and let your blood pressure go up." And I say, "I'm not, I'm not thinking about it."

But when I see the white coat - - and I think I'm not letting it bother me but the doctors usually after I go they have me check it for about a week, and it's always down after I leave there.

But, no, I'd like to think that I'm the most fair guys in the world. That's the reason I said part of being a Christian man is to be very fair to everybody. There's nobody that I look down on, because I know we're all humans.

(Id., p. 29 - 30.) Following individual questioning, the trial court found as follows concerning Juror Wagner:

THE COURT:    The Court's heard the argument of counsel, and the statements made by this juror. It appears to the court that this juror's problem is with alcohol, the Court's not aware of alcohol coming in this case, and counsel hadn't indicated that it will, other than the deceased and his widow owned places that presumably sell alcohol.

With regard to the drug issue, this juror has indicated he could listen to the evidence and weigh it and would decide the case based upon the law and the evidence without prejudice or bias, therefore the motion to strike for cause is denied.

(Id., pp. 32 - 33.) "A trial judge's determination of potential juror bias ... is a factual finding entitled to the presumption of correctness contained in 28 U.S.C. § 2254(d)." Wainright v. Witt, 469 U.S. 412, 420, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985). The undersigned agrees that Juror Wagner indicated only that he had a problem with alcohol, and alcohol was not an issue in this case. Further, Juror Wagner specifically stated that "if the defendant had no alcohol or no drugs or anything, I'd have nothing against him. My problem was a drunk driver killed my daughter." (Document No. 57, Exhibit 16, p. 31.) The undersigned notes that there was no evidence presented that Petitioner was under the influence of alcohol or drugs. Thus, Petitioner has not met his burden of rebutting by clear and convincing evidence, the presumption of correctness of the State *habeas* court's factual findings,

66

as required by 28 U.S.C. § 2254(e)(1). Even assuming Juror Wagner to have been biased, Petitioner

was not deprived of his constitutional right to a fair trial because Petitioner used a peremptory

challenge to remove Juror Wagner. See United States v. Martinez-Salazar, 528 U.S. 304, 120 S.Ct.

774, 145 L.Ed.2d 792 (2000)(holding that if a trial court refuses to strike a potentially biased juror

for cause, and the defendant subsequently chooses to exercise a peremptory challenge to cure the

trial court's error, if that defendant is subsequently convicted by a jury that no biased juror sat, he

has not be deprived of any federal constitutional right). In view of the evidence presented in the

State court proceedings, the undersigned finds that the State court's adjudication of Petitioner's

claim does not involve an unreasonable application of clearly established federal law, nor does the

State court's findings result in a decision that is based upon an unreasonable determination of the

facts. Accordingly, Petitioner's above claim should be dismissed.

**F.**     **Judicial Prejudice / Misconduct in Evidentiary Rulings.**

Relief under 28 U.S.C. § 2254 is available to State prisoners in "custody in violation of the

Constitution or laws or treaties of the United States." 28 U.S.C. § 2254 (2002). Violations of State law

and procedure that do not implicate specific federal constitutional provisions are not cognizable in

*habeas* review. See Estelle v. McGuire, 502 U.S. 62, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991)("[I]t is

not the province of a federal *habeas* court to reexamine state-court determinations on state-law

questions. In conducting *habeas* review, a federal court is limited to deciding whether a conviction

violated the Constitution, laws, or treaties of the United States."); Fisher v. Angelone, 163 F.3d 835,

854 (4th Cir. 1998). Generally, federal *habeas* relief is available with respect to a trial court's

evidentiary rulings, only if the ruling denied the defendant the right to a fair trial. See Abrams v.

Barnett, 121 F.3d 1036, 1042 (7th Cir. 1997). When the challenged evidentiary rulings "so infected

the entire trial that the resulting conviction violates due process," it is presumed that the defendant was denied a fair trial. Cupp v. Naughten, 414 U.S. 141, 147, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973). The fact that the admitted evidence allegedly was improper under State law however, does not provide a basis for habeas relief. "[T]he Due Process Clause does not permit the federal courts to engage in a finely tuned review of the wisdom of state evidentiary rules." Marshall v. Lonberger, 459 U.S. 422, 438, n. 6, 103 S.Ct. 843, 853, n. 6, 74 L.Ed.2d 646 (1983). The proper inquiry for the Court is whether the admission of the testimonial evidence itself so infected the entire trial that the resulting conviction violates due process. See Estelle, 502 U.S. at 72, 112 S.Ct. at 482.

### 1.    Trial Court did not err in failing to grant a mistrial.

Petitioner alleges that the trial court "failed to rule properly during the motion that was presented for a mistrial after it was discovered that Fayette County prosecutor gave statements that were in violation of ABA Codes of conduct." (Document No. 52, p. 22.) Petitioner contends that the trial court erred by denying the motion for a mistrial, denying the motion to take individual voir dire, and refusing to hear the testimony of George Gannon. (Id.) Specifically, Petitioner claims that "there should have been a mistrial based on the prosecutorial misconduct." (Document No. 58, p. 21.)

Respondent argues that Petitioner's claim is insufficient to state a claim. (Document No. 57, pp. 32 - 34.) Specifically, Respondent states that Petitioner has failed to (1) "explain how the trial was rendered fundamentally unfair by the prosecutor's statements to the press," (2) "demonstrate or argue that the jury was tainted or that the pretrial publicity rendered it impossible for Petitioner to have a fair trial," and (3) "argue or show that a biased juror was seated or even that any of the jurors were exposed to the statements of the prosecutor." (Id., p. 32.)

The undersigned finds that Petitioner has not demonstrated that the trial court's failure to grant a mistrial or conduct individual voir dire concerning the newspaper article written by Mr. Gannon denied Petitioner the right to a fair trial. As addressed by the undersigned in Ground D(1) above, the undersigned finds that Petitioner has not shown that the jurors who presided over his case were actually biased against him as a result of any pretrial publicity. See Dozier, 672 F.2d at 545(a federal court cannot order a new trial because of media accounts of a prosecutor's pretrial statements that have produced no proven prejudice to the defendant). Again, the Court notes that the prosecutor's comment to the press occurred prior to the empaneling of the jury, and voir dire of the jury included questioning concerning pretrial publicity. (Document No. 57, Exhibit 16, pp. 6 - 7.) There was no evidence that the jury was exposed to the newspaper article. (Id., p. 71.) Furthermore, the trial court specifically instructed the jury to not view any news reports or read any newspaper articles concerning the trial. (Id., pp. 50 - 51, 183.) The undersigned has carefully reviewed the trial transcripts and can find no evidence that the trial court's failure to grant a mistrial or conduct individual voir dire so infected the entire trial that the resulting conviction violates due process. Accordingly, Petitioner's above claim should be dismissed.

### 2.     Trial court did not err in excluding Mr. Gonzalez's out-of-court statement.

Petitioner claims that the trial court "utilized an inappropriate and fundamentally illegal method of ruling upon the motion to allow the statement of the unavailable declarant to be read into the record." (Document No. 52, p. 22.) Specifically, Petitioner states that "[i]n haste the court failed to read the statement in question in its entirety and detach from his emotions in regard to counsel for the defendant and therefore denied the motion." Petitioner contends that Mr. Gonzalez's out-of-court statement "vindicated the defendant as to the circumstances surrounding the murder, but he

69

implicated himself and Damien Bagut."(Id.) Finally, Petitioner asserts that the trial court "gave a false statement of actually reviewing the statement when in fact he had stated on the record that he did not review the statement. (Id., p. 23.)

Respondent asserts that Petitioner's claim must fail. (Document No. 57, pp. 34 - 36.) Specifically, Respondent argues that Petitioner has failed to (1) "argue or demonstrate how the court erred in denying the motion or how the trial was rendered fundamentally unfair as a result," and (2) "argue how the contents of the declarant's statements would have altered the outcome of the proceedings." (Id., p. 34.) Respondent alleges that there is no reason to believe that the jury would have given Gonzalez's testimony sufficient weight to overcome the State's case because the jury was not persuaded by Mr. Bagut, whose testimony completely exonerated Petitioner. (Id., p. 35.)

First, the undersigned finds that Petitioner's claim must be dismissed to the extent that Petitioner's claim relies upon State law and challenges the State court's evidentiary ruling. See Estelle, 502 U.S. at 67-68, 112 S.Ct. at 480. Next, the undersigned finds that the trial court's refusal to admit Mr. Gonzalez's out-of-court statement did not deny Petitioner of a fundamentally fair trial. The trial court determined that Mr. Gonzalez's out-of-court was not admissible under Rule 804(b)(5) of the West Virginia Rules of Evidence. Specifically, the trial court found as follows:

THE COURT:    All right. The Court wants to state on the record, too, that I have previously, on this past Monday, read the statement that counsel for the defendant has offered.

It's an unsworn statement. There are - - it's consisting of numerous pages. There are various individuals there. The Court is of the opinion that it's not trustworthy, doesn't come within the Rule and that they best evidence is the transcript of the hearing if they want to get into that. That is a far more - - better evidence of what this individual said.

I would think - - and I haven't read the one before Judge

70

> Hatcher, but I expect that would be testimony under oath before a judicial officer, and both parties would have an opportunity to cross-examine the witness at that time, that not being the case in the statement that is being placed in the record.

(Document No. 57, Exhibit 18, p. 41.) Subsequently, the trial court admitted into evidence the transcripts from Mr. Gonzalez's juvenile proceeding and allowed the transcripts to be read before the jury. (Id., pp. 79 - 80.) Petitioner's claim that the trial judge falsely stated that he had read Mr. Gonzalez's out-of-court statement is inaccurate. (Id., p. 41.) Rather, the trial court stated that it had not read the transcripts from Mr. Gonzalez's juvenile proceedings, but had read Mr. Gonzalez's out-of-court statement. (Id.) As discussed above, the undersigned finds that Petitioner was not unduly prejudiced by the exclusion of Mr. Gonzalez's out-of-court statement so as to render Petitioner's trial fundamentally unfair. It is undisputed that Mr. Gonzalez's did not witness the shooting. (Id., pp. 50 - 56.) Further, Mr. Bagut testified that he was the sole shooter and verified that Petitioner did not assist in deposing of the victim's body. (Id., pp. 50 - 56.) Accordingly, the undersigned concludes that Petitioner has failed to establish a denial of a federal right as to the above claim and therefore, the claim should be dismissed.

    **3.    Trial court did not err in overruling Petitioner's objection to closing argument.**

    Petitioner claims that the trial "court committed error by failing to overrule the objection of counsel for the defendant when prosecutor gave closing arguments of a possible robbery motive after the court ruled that no evidence existed to present this motive to the jury." (Document No. 52, pp. 23 - 24.) Petitioner further avers that trial court erred by allowing the prosecutor to refer to facts not in evidence during his closing argument. (Document No. 58, 23 - 24.) In response, Respondent argues that the "ruling of a trial court in sustaining or overruling an objection cannot be grounds for

71

relief without a showing of fundamental unfairness as a result." (Document No. 57, p. 37.) Respondent further contends that the prosecutor did not improperly reference evidence outside the record. (Id., p. 38.)

The undersigned finds that the trial court's failure to sustain defense counsel's objection did not deny Petitioner the right to a fair trial. As addressed in Ground (D)(3) above, the undersigned concludes that the prosecutor did not improperly refer to facts not in evidence or argue for a felony murder conviction in his closing argument. (Document No. 57, Exhibit 16, pp. 123 - 24, and 173, Exhibit 17, pp. 8 - 9, and 11, Exhibit 18, pp. 69 - 70, 89, and 104.) Again, the undersigned notes that the prosecutor's challenged comments were merely fair inferences from the evidence and testimony presented at trial. In overruling trial counsel's objection, the trial court found that the prosecutor was referring to the evidence. (Id., Exhibit 20, p. 52.) The trial court further instructed the jury that the comments of the lawyers were not evidence and were not to be considered as matters of fact, and jurors are presumed to follow the court's instructions. The undersigned has thoroughly reviewed the trial transcripts and can find no evidence that the trial court's failure to sustain defense counsel's objection so infected the entire trial that the resulting conviction violates due process. Accordingly, Petitioner's above claim should be dismissed.

**G.     Disparity of Sentencing.**

Petitioner contends that even though he "was not the prime mover in the alleged crime and evidence did reveal that he in fact had the least involvement in the crime, he was sentenced to the most time incarceration." (Document No. 52, p. 26.) Specifically, Petitioner claims that he received a twenty-five year sentence when Mr. Bagut, who admitted to being the "sole shooter," received a twenty year sentence. (Id.) Petitioner alleges that the State offered him a "plea of not being

transferred to adult status in return for his testimony against Damien Bagut" and "a plea of 16 years," which proves that Petitioner cases did not warrant a sentence greater than Mr. Bagut's sentence. (<u>Id.</u>, pp. 26 - 27.)

In response, Respondent contends that "a difference of five years between co-defendants convicted of a crime that can carry a 40-year sentence is not disparate under the circumstances." (Document No. 57, p. 40 - 41.) Respondent notes that Mr. Bagut pled guilty in exchange of a twenty-year sentence, whereas Petitioner refused a plea and proceeded to trial. (<u>Id.</u>, p. 40.) Respondent emphasizes that both Petitioner and Mr. Bagut were convicted of second degree murder, but Petitioner "received a 25-year-sentence - - five years more." (<u>Id.</u>) Respondent argues that "Petitioner's flight and subsequent extradition, his additional criminal activity (discussed briefly by the sentencing court at the hearing), and his escape from prison while awaiting trial were valid factors considered by the judge when imposing the sentence." (<u>Id.</u>, p. 41.)

The State *habeas* court found as follows:

> The jury concluded that the petitioner was guilty of murder in the second degree which was the same offense to which Damien Bagut entered a plea of guilty in the case of State of West Virginia vs. Damien Bagut. Damien Bagut was sentenced to the West Virginia Penitentiary for a definite term of twenty (20) years. The petitioner was sentenced for the same offense to a term of twenty five (25) years. The petitioner's presentence investigation showed a difference between the two co-defendants. The petitioner had escaped from custody in West Virginia and left the State of West Virginia. He remained "at large" until he got in trouble in New York and was subsequently extradited back to this jurisdiction.
>
> The petitioner was not improperly convicted of a more serious offense than his co-defendant, Damien Bagut and the sentence imposed by the Court was clearly not shocking to the conscience.

(Document No. 23-2, Exhibit 6, p. 6.)

The undersigned finds that Petitioner's sentence was not unconstitutionally disparate. The Fourth Circuit has recognized that mere disparity of sentence among co-defendants does not, in and

of itself, suggest that one defendant has been arbitrarily singled out for a more severe punishment than that normally imposed upon similarly situated defendants. See United States v. Ellis, 975 F.2d 1061, 1065 - 66 (4th Cir. 1992)(recognized that an otherwise proper sentence cannot be challenged on the basis of an alleged disparity between sentences of co-defendants); United States v. Truelove, 482 F.2d 1361 (4th Cir. 1973)(claim of disparate sentences imposed on co-defendants held to be without merit where the sentence did not exceed the statutory limits and it did not appear the defendant receiving the lengthier sentence was arbitrarily singled out). A review of the record reveals that Petitioner was not arbitrarily singled out for a more severe punishment. Petitioner's circumstances were not similar to those of Mr. Bagut, who entered into a plea and was sentenced to twenty years. The trial court has discretion in imposing sentences and can consider factors such as each co-defendant's respective involvement in the criminal transaction, prior records, rehabilitative potential, and lack of remorse. Petitioner's flight to New York and subsequent escape from custody while awaiting trial are clearly within the broad range of information that may be properly considered by the sentencing judge. Petitioner is incorrect in his assumption that his sentence should not exceed that of his co-defendant. See United States v. Lindell, 881 F.2d 1313, 1324 (5th Cir. 1989), cert. denied, 496 U.S. 926, 110 S.Ct. 2621, 110 L.Ed.2d 642 (1990)("[a] defendant cannot rely upon his co-defendants' sentences as a yard-stick for his own"). Furthermore, Petitioner's conviction of second-degree murder subjected him to a potential sentence of forty years in the State penitentiary. In view of the foregoing, the undersigned finds that the Petitioner's claim of disparity of sentencing should be dismissed.

H.      **Commutative Error.**

Petitioner claims that the cumulative errors of the trial court, counsel, and the prosecutor "created an atmosphere that would deem this petitioner's entire trial process unconstitutional." (Document No. 52, p. 28.) In Arnold v. Evatt, 113 F.3d 1352 (4th Cir. 1991), the Fourth Circuit Court of Appeals specifically rejected a request to cumulatively review alleged trial court errors. Id. Under the cumulative error analysis, the individual claims of error must first be reviewed on the merits to determine if they are in fact actual errors. See Fisher v. Angelone, 163 F.3d 835 (4th Cir. 1998); United States v. Russell, 34 Fed.Appx. 927 (4th Cir. 2002) (unpublished). It has already been determined that Petitioner's ineffective assistance of counsel claims are without merit and, therefore, do not constitute error. The allegations of prosecutorial misconduct were found non-prejudicial, and therefore, do not constitute actual error. Additionally, Petitioner claims concerning error made by the trial court have been deemed without merit. The undersigned has otherwise not found any error in the conduct of the trial of constitutional magnitude as Petitioner claims. Accordingly, the undersigned finds that there is no error to cumulate in this case.

## PROPOSAL AND RECOMMENDATION

Accordingly, the undersigned hereby respectfully **PROPOSES** that the District Court confirm and accept the foregoing findings and **RECOMMENDS** that the District Court **GRANT** Respondent's Motion to Dismiss or in the alternative for Summary Judgment (Document No. 57.), **DISMISS** Petitioner's Petition (Document No. 1.) and remove this matter from the Court's docket.

The parties are hereby notified that this "Proposed Findings and Recommendation" is hereby **FILED**, and a copy will be submitted to the Honorable United States District Judge Thomas E. Johnston. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rule

6(e) and 72(b), Federal Rules of Civil Procedure, the parties shall have thirteen days (ten days, filing of objections and three days, mailing/service) from the date of filing of this Proposed Findings and Recommendation within which to file with the Clerk of this Court specific written objections identifying the portions of the Findings and Recommendation to which objection is made and the basis of such objection. Extension of this time period may be granted for good cause.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155, 106 S.Ct. 466, 475, 88 L.Ed.2d 435 (1985); Wright v. Collins, 766 F.2d 841, 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir.) *cert. denied*, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.Ed.2d 352 (1984). Copies of such objections shall be served on opposing parties, District Judge Johnston, and this Magistrate Judge.

The Clerk of this Court is directed to file this "Proposed Findings and Recommendation" and to mail a copy of the same to counsel of record and to Petitioner, who is acting *pro se*.

Date: January 16, 2009.

R. Clarke VanDervort
United States Magistrate Judge